IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FILED
US DISTRICT COURT CLERK
WESTERN DISTRICT OF KY
20 FEB -7 PM 2:09

| | |
|---|---|
| UNDER SEAL | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No: 3:20-cv-95-RGJ |
| | ) |
| UNDER SEAL | ) **FILED UNDER SEAL** |
| | ) **DO NOT PLACE IN PRESS BOX** |
| | ) **DO NOT ENTER ON PACER** |
| Defendants. | ) |
| | ) **DEMAND FOR JURY** |

i

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISON

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ex rel. MARSHA RIGNEY and ) <br> JANET WATTS ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> INTREPID, U.S.A. Inc. ) <br> ) <br> ) <br> Defendant. ) <br> ) | Case No: 3: 20-CV-95-RGJ <br><br> **FILED UNDER SEAL** <br> **DO NOT PLACE IN PRESS BOX** <br> **DO NOT ENTER ON PACER** <br><br> **DEMAND FOR JURY** |

## *QUI TAM* COMPLAINT

Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA" or the "False Claims Act"), Relators Marsha Rigney and Janet Watts, on behalf of themselves and the United States of America, allege and claim against Intrepid, U.S.A. Inc. as follows:

ii

## Table of Contents

*QUI TAM* COMPLAINT ..............................................................................................ii

BRIEF STATEMENT OF THE CASE................................................................................1

JURISDICTION AND VENUE ..........................................................................................2

PARTIES ..............................................................................................................................2

APPLICABLE LAW .............................................................................................................5

   I.    The False Claims Act.....................................................................................................5

   II.   Medicare Home Health Coverage ...............................................................................7

      A.   Medicare Home Health Payment Provisions ........................................................9

      B. Medicare Home Health "Face-to-Face" Requirements.........................................10

      C. CMS and HHS-OIG Have Scrutinized HHA Face-to-Face Documentation and Determined Compliant Face-to-Face Documentation is Material to Payment for Home Health Services ...12

      D. Medicare "Home Bound" Requirements................................................................13

      E. Assisted Living Facility Duplicative Home Care Regulations .............................15

      F. Skilled Nursing Care and Skilled Therapy Requirements ...................................17

      G.   Requirements for Providing Specialized Skilled Nursing Care Including Psychiatric Care ...............................................................................................................................18

      H.   Impact of Home Health Fraud on the Medicare System, Additional Data Requests Audits and MAC Targeted Probe and Educate Audits........................................................20

      I.   Medicare Certifications – Which Defendant Falsified ........................................23

DEFENDANT'S FRAUDULENT SCHEMES...................................................................25

   I.    Defendant Intrepid's Corporate Policies Knowingly Cause the Submission of False Claims ...............................................................................................................................25

      A.   Intrepid Improperly Incentivizes Sales and Clinical Employees to Admit Home Health Patients, Regardless of Patient Eligibility .............................................................25

      B.   Intrepid's Corporate Structure is Intentionally Designed to and Results in Sales Department Employees Having Improper Control Over Patient Eligibility Decisions, Causing False Claims to be Submitted .....................................................................................27

      C.   Intrepid's Institutionalized Improper Solicitation of Recently Discharged Patients, Which Causes False Claims to be Submitted ..............................................................33

      D.   Intrepid Corporate and Middle Management Fails to Disclose and Intentionally Hides Patient Abuse, Neglect, and Evidence of False Claims..............................................36

   II.   Defendant Intrepid U.S.A.'s False Claims ................................................................37

      A.   False Claims for Non-Qualifying Patients. ...........................................................37

      B.   Defendant Intrepid USA Knowingly Bills Medicare for Duplicative and Medically Unnecessary Home Health Services Purported to be Provided to Patients Residing in Facilities, or a Distinct Part of a Facility, that Provides Full Nursing Care to Patients. ...........42

      C.   Defendant Intrepid USA Knowingly Bills Medicare for Home Health Services That Were Never Provided. ...............................................................................................................46

      D.   Defendant Intrepid USA Knowingly Bills Medicare for Home Health Therapy Services that are Medically Unnecessary. .......................................................................................48

      E.   Defendant Intrepid Bills Medicare for Home Health Care Provided to Psychiatric Patients but Does Not Employ Required Specialized Psychiatric Nursing Staff, Thereby Submitting False Claims ...............................................................................................50

**F.    Defendant Intrepid Knowingly and Improperly Avoids Obligations to Pay Money to the United States** ...................................................................................................................52

**G.    Defendant Intrepid USA Knowingly Bills Medicare for Home Health Services Without Performing Services and Certifications Required for Payment.** ............................................54

**H.    Intrepid's Corporate Management Decides to By-Pass the Requirement that the Plan of Care Contain the Accurate Date of the Completed Face-to-Face Encounter.** ...........................58

**I.    Relators' Efforts to Prevent False Claims from Being Submitted and Retaliatory Discharge in Violation of 31 U.S.C. §3730(h)** ...............................................................................61

**COUNT ONE** ..........................................................................................................................67

**COUNT TWO** .........................................................................................................................68

**COUNT THREE** .....................................................................................................................70

**COUNT FOUR** .......................................................................................................................71

**COUNT FIVE** ..........................................................................................................................71

**COUNT SIX** ............................................................................................................................72

## BRIEF STATEMENT OF THE CASE

1.       Defendant Intrepid, U.S.A. Inc. ("Defendant" or "Intrepid") has, on an ongoing basis, systematically defrauded the United States by submitting false claims for payment to the Medicare Program for home health care services purportedly provided to patients who do not qualify for the Medicare home health benefit; home care patients who were not appropriately certified as eligible for home care; home care and therapy services that were not reasonable or medically necessary; services that were provided by unlicensed and untrained staff; and services that were not actually provided.

2.       Moreover, Intrepid intentionally deceives and willfully disregards instruction from Medicare administrative auditors to perpetrate and conceal its widespread fraud. When faced with administrative liability stemming from Medicare audits uncovering the submission of false claims, Intrepid unlawfully conceals or avoids its obligation to repay funds to the Medicare program—in violation of the "reverse false claims" provision of the FCA. 31 U.S.C. § 3729(a)(1)(g).

3.       Intrepid's systematic fraud is orchestrated and implemented by the highest levels of the organization, encompassing its Chief Executive Officer, Chief Operations Officer, Chief Compliance Officer, and Vice President of Sales. Led by these executives, non-clinical Intrepid employees improperly influence and dictate patient care based not on the patient's needs but driven solely by goals of maximizing Intrepid's revenue from the cash-strapped Medicare program. To further this goal, Intrepid stymies internal compliance efforts and retaliates against employees who attempt to prevent fraud against Medicare. Relators Rigney and Watts sought to promote compliance within Intrepid and prevent false claims from being submitted. In direct response,

1

Intrepid retaliated against Relators by terminating their employment, in violation of the FCA. 31 U.S.C. § 3730(h).

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, 31 U.S.C. §§3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331. Jurisdiction is also authorized under 31 U.S.C. §3732(a).

5.      Venue lies in this judicial district pursuant to 31 U.S.C. §3732(a), because Defendant qualifies to do business in the State of Kentucky, transacts substantial business in the State of Kentucky, transacts substantial business in this judicial District, and can be found here. Furthermore, Defendant committed within this judicial District acts proscribed by 31 U.S.C. §3729, to-wit: Defendant submitted to the United States false claims for payment for home health services that were provided to ineligible, non-homebound patients, submitted in violation of Medicare billing requirements, or medically unnecessary and improper; and made or used false records material to such false claims and knowingly concealed obligations to repay funds to the Medicare program.

## PARTIES

6.      Defendant Intrepid, U.S.A. Inc. ("Intrepid" or "Defendant") is a corporation based in Carrollton, Texas engaged in the business of providing home health and hospice services. Intrepid has roughly 89 service locations in 21 different states. About 80% of Intrepid's business is in home health services. Intrepid specifically targets potential home health patients enrolled in the Medicare Program, and therefore nearly all Intrepid's revenue is derived from the taxpayer-funded Medicare Program.

7.      Relator Marsha Rigney has over 25 years of experience in the health care industry, including over 15 years in home health management.   Relator Rigney was employed with Defendant Intrepid from April 2018 to July 31, 2019 when Intrepid terminated her in retaliation for her efforts to prevent Intrepid's submission of false claims, in violation of 31 U.S.C. 3730(h). Relator Rigney was initially employed by Intrepid as a Regional Director of Operations, Clinical Quality and Patient Experience.   In this role, Relator Rigney had direct oversight of operations, and clinical and regulatory compliance of 17 Intrepid home health offices across Georgia, Alabama, Louisiana, Arkansas, and North Carolina. After moving to this position, Relator Rigney immediately recognized that Intrepid's operations throughout these states had serious compliance problems and that Intrepid was habitually submitting false claims for payment to Medicare.  In her attempt to bring these agencies into compliance with Medicare conditions of payment, Relator Rigney sought to overhaul the operations and compliance of these agencies.  Relator Rigney was consistently undermined and contradicted, however, by executive-level employees who furthered Intrepid's systematic fraud.

8.      In February 2019, Relator Rigney moved from Regional Director of Operations to a compliance-focused role, becoming the Corporate Director of Clinical Excellence and Integrity, with direct oversight of Intrepid's nationwide clinical operations.   In this role, Relator Rigney realized that compliance issues and the resulting submission of false claims were pervasive throughout the company's nationwide footprint.   Relator Rigney supervised and managed Defendant's clinical audit programs, often interfacing with Medicare contractor audits and developing solutions to clinical quality problems identified by Medicare audits. Relator Rigney's efforts to ensure compliance were met with opposition from Intrepid—specifically, Intrepid's senior management.  Moreover, Relator Rigney discovered that Intrepid knowingly implemented

3

programs designed to mislead Medicare auditors and avoid overpayment liabilities owed to Medicare. After raising concerns about this institutionalized fraud, Relator Rigney was retaliated against and terminated from her employment with Intrepid, in violation of 31 U.S.C. § 3730(h).

9.    Relator Janet Watts has over 13 years of experience in the health care industry. Relator Watts was employed with Defendant Intrepid from August 2017 to July 31, 2019 when Intrepid terminated her in retaliation for her efforts to prevent Intrepid's submission of false claims, in violation of 31 U.S.C. 3730(h). Relator Watts was initially employed by Intrepid as an "administrator" of the Birmingham, AL; Anniston, AL; and Montgomery, AL Intrepid agencies from August 2017 to March 2019. As administrator, Relator Watts was the primary managerial employee of each of these agencies and responsible for the agencies' operations, clinical, and compliance functions. Upon assuming this role, Relator Watts quickly recognized that many of the patients in these agencies were inappropriate for the Medicare Home Health Benefit.

10.    In March 2019, Relator Watts was promoted to Regional Manager of Clinical of Excellence within the Intrepid compliance department. In this role, Relator Watts was charged with performing surveys and mock audits of Intrepid agencies to review compliance functions and patient eligibility. To perform these surveys and audits, Relator Watts would review clinical and compliance documentation which identified prolific non-compliance and fraud. Relator Watts also personally visited agencies and observed patient care conferences (where eligibility should be discussed and certification decisions made), visited patients in their homes to independently assess eligibility and educated clinicians on Medicare eligibility guidelines. From this experience, Relator Watts discovered Intrepid habitually submitted false claims for payment to the Medicare program. Because of her efforts to identify and remedy Intrepid's fraud, Relator Watts was

4

retaliated against and terminated from her employment with Intrepid, in violation of 31 U.S.C. § 3730(h).

11.     Prior to filing this Complaint, Relators voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3729(e)(4)(A), Relators are the original source of the information for purposes of that Section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## APPLICABLE LAW

### I.  The False Claims Act

12.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; (4) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or (5) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

13.     Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

14.     The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

15.     The FCA defines the term "obligation" as an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

16.     Additionally, the FCA provides relief from retaliatory actions: (1) In general. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or

6

associated others in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter. 31 U.S.C. § 3730(h)

## II. Medicare Home Health Coverage

17.     The Medicare Program is established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, and provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

18.     CMS administers many aspects of the Medicare program through contracts with third-party Medicare Administrative Contractors (MACs). 42 U.S.C. § 1395kk-1. Through these contracts, MACs perform the following functions, among others, in the administration of the Medicare program: determination of payment amounts, making payment, and reviewing the activities of medical providers, including medical utilization and fraud review. 42 U.S.C. § 1395kk-1; 42 U.S.C. § 1395ddd.

19.     As part of its coverage, Medicare pays for some "home health services" for qualified patients. To qualify for home health care reimbursement under Medicare, a patient must be certified by a physician, or non-physician practitioner working in collaboration with the physician, as eligible for Medicare home health services. When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. 42 U.S.C. §1395x(m).

20.     To be eligible for Medicare home health services, the patient must:

(i)  Need intermittent skilled nursing services or physical, speech, or occupational therapy;

(ii) Be homebound ("confined to the home") as defined by Medicare;

7

(iii) Have a plan of care established, which will be periodically reviewed by a physician;

(iv) Be furnished home health services while the patient was or is under the care of a physician; and

(v) Have a "face-to-face" in-person encounter with a physician to ensure that the physician has assessed the patient and can personally certify that the patient meets the eligibility criteria for Medicare home health services.

*See* 42 U.S.C. § 1395(f)(a)(2)(C); 42 C.F.R. § 424.22

21.     In order for Medicare to pay for home health services, the certifying physician must then sign a certification statement attesting that the patient meets the above eligibility requirements.  42 U.S.C. § 1395(f)(a)(2)(C); 42 C.F.R. §424.22.

22.     Most providers use CMS Form 485 for the Plan of Care and Physician Certification. Therefore, a home health Certification and Plan of Care is commonly referred to as "a 485." CMS Form 485 provides boxes to input pertinent demographic and clinical information required for a patient to be admitted for home health care, including Principal Diagnosis, Medications, Functional Limitations, and Mental Status, as well as Order for Discipline and Treatments, Goals/Rehabilitation, and Potential/Discharge Plans. *See* CMS Form 485.  Further, CMS Form 485 requires the Certifying Physician's Name and Address and requires the Certifying Physician to sign and date the certification statement, which reads:

> I certify this patient is confined to his/her home and needs intermittent skilled therapy and/or speech therapy, or continues to need occupational therapy.  This patient is under my care, and I have authorized the services on this plan of care and will periodically review the plan.  **I further certify this patient had a face-to-face encounter that was performed on xx/xx/xxxx by a physician or Medicare allowed non-physician practitioner that was related to the primary reason the patient requires home health services.**

*See* CMS Form 485(emphasis added)

23.     CMS Form 485 also forewarns: "Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws." *See* CMS Form 485.

24.     The certification of need for home health services must be obtained at the time that the home health plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan of care. 42 C.F.R. § 424.22. Therefore, as evidenced in the sample CMS Form 485, CMS requires Home Health Agencies (HHAs) to include the certification of need for home health services on the same document as the Plan of Care.

**A. Medicare Home Health Payment Provisions**

25.     HHAs are paid by Medicare through a Prospective Payment System (PPS). *See* 42 C.F.R. § 484.205. The PPS is based on a national prospective 60-day episode payment, a rate based on the average cost of care over a 60-day episode of home health care for the patient's diagnostic group.

26.     Normally, the 60-day episode payment is made in two payments. 42 C.F.R. § 484.205. The initial payment is made in response to a "request for anticipated payment" (RAP). The RAP for the initial 30-day period is paid to an HHA at 60 percent of the case-mix and wage adjusted 30-day payment rate. The RAP is a "claim for purposes of Federal, civil, criminal and administrative law enforcement authorities, including but not limited to...The Civil False Claims Act (as defined in 31 U.S.C. § 3729(c))." 42 C.F.R. § 484.205

27.     The HHA must meet the following conditions to in order to submit a RAP:

    (i)     The Outcome and Assessment Information Set (OASIS) assessment is
            complete, locked and finalized for transmission to the national assessment
            system;

(ii)     A physician's verbal orders for home care have been received and documented as required by Medicare;

(iii)    A plan of care has been established and sent to the physician as required;

(iv)    The first service visit under the established plan of care has been delivered.

28.     Therefore, it is impermissible and non-billable to submit a RAP without performing the face-to-face encounter in at least two ways. First, because CMS and the Home Health MACs have required the certification of need for home health services—including dated documentation of the face-to-face encounter—to be included on the same document as the plan of care, the HHA cannot submit a RAP because it has not met the requirements of 42 C.F.R. § 484.205. Second, it is impermissible and non-billable for an HHA to bill Medicare for home health services prior to performing a complete certification of need—including the face-to-face evaluation.[1]

### B. Medicare Home Health "Face-to-Face" Requirements

29.     ***Prior to certifying that a patient is eligible*** for Medicare home health services, the physician must document that the physician himself or herself, or Non-Physician Practitioner working in collaboration with the physician ***has had*** a face-to-face encounter with the patient. 42 U.S.C. § 1395(f)(a)(2)(C) (emphasis added).

30.     "The face-to-face encounter requirement was enacted, in part, to discourage physicians certifying patient eligibility for the Medicare home health benefit from relying solely on information provided by the HHAs when making eligibility determination and other decisions about patient care." 79 Fed. Reg. 66038 (November 6, 2014)

---

[1] Medicare Benefit Policy Manual Ch. 7; §30.5.1.("The certification must be complete prior to when an HHA bills Medicare for reimbursement"); *See also* 42 U.S.C. § 1395(f)(a)(2)(C)(***Prior to certifying that a patient is eligible*** for Medicare home health services, the physician must document that the physician...***has had*** a face-to-face encounter with the patient) See 42 C.F.R. § 424.22(To certify eligibility for home health services, the physician must certify..."a face-to-face patient encounter...**occurred**). (Emphasis added)

31.     All Medicare Administrative Contractors have scrutinized home health certifications and emphasized that providers must include the date that the face-to-face encounter occurred on the certification document.[2]   For instance, CGS—a Home Health Medicare Administrative Contractor that administers the Medicare Home Health Benefit in the following states: Colorado, Delaware, Iowa, Kansas, Maryland, Missouri, Montana, Nebraska, North Dakota, South Dakota, Pennsylvania, Utah, Virginia, West Virginia, Wyoming, and the District of Columbia—provides that "CGS has observed many physician certifications do not contain a statement for documenting the date of the face-to-face encounter... The certifying physician must also document the date of the encounter."[3]

32.     A face-to-face patient encounter must be performed no more than 90 days prior to the start of the home health start of care date or within 30 days of the start of home health care. *See* 42 C.F.R. § 424.22.  Therefore, pursuant to the Medicare guidelines, a home health patient can start home health services prior to receiving a face-to-face encounter. **However, the face-to-face patient encounter must be performed and certification completed prior to billing Medicare for home health services**.[4]  Logically, it is axiomatic that a critical part of the home health certification process—wherein the certifying physician personally evaluates the patient for home health eligibility—must be completed prior to certifying that the patient is eligible for home health care and prior to billing for such care.  Accordingly, the certification of need for home health

---

[2] Centers for Medicare and Medicaid; Home Health Referrals and Clinical Documentation Requirements. (June 27, 2018); available here: https://resources.hthu.net/site/wp-content/uploads/2018/07/DG-Home-health-work-sheet.pdf
[3] CGS; Home Health Physician Certification. Available at:
https://cgsmedicare.com/hhh/pubs/news/2018/0118/cope5731.html

[4] Medicare Benefit Policy Manual Ch. 7; §30.5.1. See also 42 U.S.C. § 1395(f)(a)(2)(C)(*Prior to certifying that a patient is eligible* for Medicare home health services, the physician must document that the physician...*has had* a face-to-face encounter with the patient) See 42 C.F.R. § 424.22(To certify eligibility for home health services, the physician must certify..."a face-to-face patient encounter...**occurred**).  (emphasis added)

11

services by the HHA, including the face-to-face encounter, must be complete prior to the HHA's submission of claims to Medicare for reimbursement.[5]

## C.  CMS and HHS-OIG Have Scrutinized HHA Face-to-Face Documentation and Determined Compliant Face-to-Face Documentation is Material to Payment for Home Health Services

33.     CMS has made clear that claims for Medicare home health services are payable only on the condition that a face-to-face visit has been completed and properly documented: "If the certifying physician does not complete the documentation correctly, CMS can deny the HHA payment because the face-to-face requirement is a Medicare condition of payment.  CMS holds the HHA financially accountable for ensuring that the documentation from the physician meets the applicable criteria."[6]  Further, "if the requirements for certification are not met, then claims for subsequent episodes of care, which require a recertification, will be non-covered—even if the requirements for recertification are met."[7]

34.     The Department of Health and Human Services Office of Inspector General (HHS-OIG) has recently scrutinized deficient and improperly executed home health face-to-face encounter documentation.[8]  In a 2014 Report, HHS-OIG found in its sample review of HHA face-to-face documentation that in 32 percent of home health claims for episodes requiring face-to-face encounters, the documentation did not meet Medicare requirements, resulting in $2 billion in

---

[5] Medicare Benefit Policy Manual Ch. 7; §30.5.1.

[6] Department of Health and Human Services; Office of Inspector General. "Limited Compliance with Medicare's Home Health Face-to-Face Documentation Requirements." Report OEI-01-12-00390 (April 2014) Available at: https://oig.hhs.gov/oei/reports/OEI-01-12-00390.pdf

[7] Medicare Program Integrity Manual Chapter 6 – Medicare Contractor Medical Review Guidelines for Specific Services. §6.2.1

[8] Department of Health and Human Services; Office of Inspector General. "Limited Compliance with Medicare's Home Health Face-to Face Documentation Requirements." Report OEI-01-12-00390 (April 2014) Available at: https://oig.hhs.gov/oei/reports/OEI-01-12-00390.pdf

payments that should not have been made.[9]  Of the 32 percent of claims that did not meet Medicare requirements, 17 percent (or $941 million in improper payments) failed to meet Medicare requirements because a person other than the certifying physician signed the face-to-face documentation.  Other required elements of the face-to-face documentation found to be deficient were: Date of the Face-to-Face Encounter (resulting in $118.8 million in improper payments); Date When Physician Signed Document (resulting in $106.7 million in improper payments); and Physician Signature Left Blank (resulting in $42.3 million in improper payments).[10] Consequently, based on HHS-OIG specific statements and Medicare regulations, an HHA's completion of face-to-face encounters in accordance with Medicare guidelines is material to claims for home health services, and failure to conform to these requirements results in false claims. *See Universal Health Services, Inc. v. U.S.*, 136 S.Ct. 1989, 2003 (2016).

### D. Medicare "Home Bound" Requirements

35.    For a patient to be eligible to receive covered home health services under both Medicare Part A and Part B, a physician must certify in all cases that the patient is confined to his/her home.

36.    It is the responsibility of the HHA to independently assess and verify whether a patient is homebound before it can bill and receive payment for home health services from Medicare.  42 C.F.R. §484.55.

37.    Medicare defines "confined to the home" (homebound) as meeting the following criteria.  First, the patient must either:

---

[9] *Id.*
[10] *Id.*

13

- **Require the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person in order to leave their place of residence**

**OR**

- **Have a condition such that leaving his or her home is medically contraindicated**

38.     If the patient meets one of the above criteria, then the patient must ALSO meet both additional requirements of:

**- There must exist a normal inability to leave home;**

**AND**

**- Leaving home must require a considerable and taxing effort.**

Medicare Benefit Policy Manual ("MBPM") Ch. 7, §30.1.1.

39.     Further defining the term "homebound," CMS has issued guidelines recognizing a narrow exception, when a patient must leave the home under extraordinary circumstances allowing an HHA to nevertheless continue to receive federal reimbursement for home health services so long as the patient is otherwise homebound and only: (a) leaves the home infrequently; (b) for a short period of time; or (c) to receive medical treatment that cannot be provided in the home setting. *See* Medicare Benefit Policy Manual ("MBPM") Ch. 7, §30.1.1.

40.     For an HHA to receive payment from Medicare, a beneficiary must actually be homebound, notwithstanding the existence of an otherwise valid certification of homebound status by a physician. *See e.g. U.S., ex rel., Prather v. Brookdale Senior Living Communities, Inc.,* No. 3:12-CV-00764, 2015 WL 1509211, at *4 (M.D.Tenn. Mar. 31, 2015) (in addition to the physician's certification, "[M]edicare also conditions payment on the beneficiary's actually being homebound and actually needing skilled services").

14

41.     Additionally, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.   Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

**E. Assisted Living Facility Duplicative Home Care Regulations**

42.     For the purposes of determining whether a person is "homebound," the patient's residence is wherever he or she makes her home.[11]   However, certain institutions, or distinct parts of institutions, may not be considered a patient's residence and therefore patients residing in these institutions are not entitled to have payment made for home health services under the Medicare Home Health Benefit.[12]   These excluded institutions include hospitals, skilled nursing facilities, and most nursing facilities that receive payment under Medicaid.

43.     Specifically, patients residing in institutions that are primarily engaged in providing to inpatients the following services are not entitled to Medicare-covered home health services:

- Diagnostic and therapeutic services for medical diagnosis;

- Treatment;

- Care of injured, disabled, or sick persons;

- Rehabilitation services or other skilled services needed to maintain a patient's current condition or to prevent or slow further deterioration; or

- Skilled nursing care or related services for patients who require medical or nursing care.[13]

---

[11] Medicare Benefit Policy Manual Chapter 7 §3.1.2.
[12] *Id.*
[13] *Id.*

15

44.     "[Medicare does not pay for] services that are not necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member from Medicare coverage."[14]  Accordingly, the provision of "services to people who already have access to appropriate care from a willing caregiver would not be considered reasonable and necessary to the treatment of the individual's illness or injury."[15]

45.     Additionally, if services furnished by the HHA are duplicative of services furnished by an assisted living facility when provision of such care is required of the facility under State licensure requirements, claims for such services should be denied because such services are not medically necessary.[16]  Many states impose stringent staffing regulations upon Alzheimer's-focused residential care centers often referred to as "Memory Care Units," including states where Relators have knowledge that Intrepid routinely bills for non-billable, duplicative home care nursing services.

46.     Generally, Memory Care Units are required to have specialized trained nursing staff available to meet patients' nursing needs 24-hours a day. For example, Kentucky requires that certain facilities providing care to residents with a primary diagnosis of Alzheimer's disease or related disorder "have adequate personnel to meet the needs of the patients on a twenty-four (24) hour basis. The number and classification of personnel required shall be based on the number of patients and the amount and kind of personal care, nursing care, supervision, and program need to meet the needs of the patients as determined by medical orders and services required for licensure."[17]  Similarly, Georgia requires that "in addition to all other requirements [for assisted living facilities], where an assisted living community holds itself out as providing additional or

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] 902 KY Admin Regs. § 20:291.

16

specialized care to persons with probable diagnoses of Alzheimer's Disease or other dementia or charges rates in excess of that charged other residents because of cognitive deficits which may place the residents at risk of eloping, the assisted living community must meet additional requirements."[18]  These additional requirements include staffing the Memory Care Units with sufficient specially trained staff to meet the unique needs of the residents in the unit. Further, Georgia requires ALF Memory Care Units to have "at least one staff member who is awake and supervising the unit at all times and sufficient numbers of trained staff on duty at all times to meet the needs of the residents."

### F. Skilled Nursing Care and Skilled Therapy Requirements

47.     To be eligible for the Medicare Home Health Benefit, a patient must require skilled nursing services or skilled therapy services. *See* 42 C.F.R. § 424.22.

48.     To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel. *See* Medicare Benefit Policy Manual Ch. 7; §40.1.

49.     Skilled nursing services are covered when an individualized assessment of the patient's clinical condition demonstrates that the specialized judgment, knowledge, and skills of a registered nurse or, in certain instances, a licensed practical nurse are necessary.  Accordingly, the services of a home health aide do not qualify as skilled nursing services.[19]  Further, coverage of

---

[18] Georgia Department of Community Health; Healthcare Facility Regulation; Rules and Regulations for Assisted Living Communities; Additional Requirements for Specialized Memory Care Units.  Ch. 11-8-63-.19

[19] Home Health Aide Services are covered under the Medicare Home Health Benefit when the services are reasonable and necessary to the treatment of the patient's illness or injury, among other requirements.  Covered home health aide services include "personal care" which is defined in part as bathing dressing, caring for hair, nail and oral hygiene needed to facilitate treatment or to prevent deterioration of patient health, feeding, assistance with elimination (including routine catheter care), assistance with ambulation, changing position in bed and assistance with transfers. See Medicare Benefit Policy Manual Ch. 7 § 50.2

17

skilled nursing care does not turn on the presence or absence of a patient's potential for improvement from the nursing care, but rather on the patient's need for skilled care.

50.     When, however, the individualized assessment does not demonstrate such a necessity for skilled care, including when the services needed do not require skilled nursing care because they could safely and effectively be performed by the patient or unskilled caregivers, such services will not be covered under the Medicare home health benefit.

51.     The Medicare Home Health Benefit also covers Skilled Therapy Services.  42 C.F.R. 424.22.  To be covered as skilled therapy, however, the services must require the skills of a qualified therapist and must be reasonable and necessary for the treatment of the patient's illness or injury.  Again, coverage does not turn on the presence or absence of an individual's potential for improvement, but rather on the beneficiary's need for skilled care.

52.     Assuming all other eligibility and coverage criteria have been met, the skilled therapy services must be reasonable and necessary to the treatment of the patient's illness or injury within the context of the patient's unique medical condition. To be considered reasonable and necessary for the treatment of the illness or injury:

a.     The services must be consistent with the nature and severity of the illness or injury, the patient's particular medical needs, including the requirement that the amount, frequency, and duration of the services must be reasonable; and

b.     The services must be considered, under accepted standards of medical practice, to be specific, safe, and effective treatment for the patient's condition. The home health record must specify the purpose of the skilled service provided.[20]

## G.  Requirements for Providing Specialized Skilled Nursing Care Including Psychiatric Care

---

[20] Medicare Benefit Policy Manual Chapter 7; §40.2.1.

53.     When specific criteria are met, specialized nursing care required by a patient suffering from a diagnosed psychiatric disorder may be covered as skilled nursing services under the Medicare Home Health Benefit.[21]  Critically, to adequately provide the unique care required by patients suffering from psychiatric disorders, a skilled psychiatric nurse is required to provide the necessary care. Such necessary care includes observation/assessment, teaching/training activities, management and evaluation of a patient care plan, or direct patient care of a diagnosed psychiatric condition which may include behavioral/cognitive interventions.[22]

54.     "Psychiatrically trained nurses are nurses who have special training and/or experience beyond the standard curriculum required for a registered nurse (RN)."[23] The services of the psychiatric nurse are to be provided under a Plan of Care established and reviewed by a physician.

55.     To qualify as having the required special training and/or experience to provide billable home care to psychiatric patients, the nurse must be a registered nurse with either a Master's degree with a specialty in psychiatric or mental health nursing and nursing experience in a psychiatric setting; a registered nurse with a Bachelor's degree and a minimum of one year of recent nursing experience in specific psychiatric settings, or a registered nurse with at least two years of recent nursing experience in specific psychiatric settings.[24]

---

[21] Medicare Benefit Policy Manual Chapter 7; §40.1.2.15.

[22] Local Coverage Determination (LCD): Home Health – Psychiatric Care (L34561); Palmetto GBA. Available at: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=34561 (Palmetto GBA is the Home Health MAC for the following states: New Mexico, Texas, Oklahoma, Louisiana, Arkansas, Illinois, Indiana, Ohio, Kentucky, Tennessee, Mississippi, Alabama, Georgia, Florida, South Carolina and North Carolina.)

[23] Id.

[24] *See Id.*

19

**H. Impact of Home Health Fraud on the Medicare System, Additional Data Requests Audits and MAC Targeted Probe and Educate Audits.**

56.     According to a current report by the Inspector General for HHS, "[t]he Medicare home health benefit has long been recognized as a program area prone to fraud.[25]  Medicare home health fraud has steadily increased over time, shows no sign of abating, and becomes an ever more dangerous threat to the fiscal integrity[26] of the Medicare system as Medicare home health payments continue to rise.  Taxpayers paid over \$18 billion to HHAs through Medicare in 2015.[27]  More than half of those payments—over \$10 billion—were the result of fraud.

57.     Even while corporate raiders steal more than \$10 billion annually from taxpayers through fraudulent, wasteful, and abusive home health billing schemes, the best efforts of the government recover less than \$250 million each year.[28] Accordingly, less than 3% of all Medicare home health fraud is recovered by the government, as the Medicare system itself teeters on the verge of brink of bankruptcy.

58.     In addition to court actions alleging fraud against home health companies, CMS and the MACs administering the Medicare Home Health Benefit conduct audits of home health

[25] HHS, Office of Inspector General, "OIG Online Portfolio: Home Health" *available at* https://oig.hhs.gov/reports-and-publications/portfolio/home-health/ One of the earliest and largest home health fraud prosecutions dates back 30 years and involved many of the same general types of allegations in the instant action, regarding the largest nationwide home health company at the time, ABC Home Health. *See* U.S. GAO, "Allegations Against ABC Home Health" (July 1995) *available at* http://www.gao.gov/assets/230/221482.pdf; AHC Media, "Mills May Be in Prison, But He's Still Free to Talk" (September 1, 1997) *available at* https://www.ahcmedia.com/articles/38137-mills-may-be-in-prison-but-he-s-still-free-to-talk

[26] Trustees for the Hospital Insurance Trust Fund (which accounts for Medicare income and disbursements) estimate that Medicare's asset reserves will be fully depleted in the next 12 years if the current rates of spending and fraud remain. *See* SOC. SEC. & MEDICARE BDS. OF TR., STATUS OF THE SOCIAL SECURITY AND MEDICARE PROGRAMS: A SUMMARY OF THE 2014 ANNUAL REPORTS 1 (2014); for a brief discussion of the "dire straits" of Medicare and the Hospital Insurance Trust Fund, see James F. Barger, Jr., *Life, Death, and Medicare Fraud*, 53 AM. CRIM. L. REV. 1, 17-18 (2016).

[27] HHS, Office of the Inspector General, "Nationwide Analysis of Common Characteristics in OIG Home Health Fraud Cases" (June 2016) *available at* https://oig.hhs.gov/oei/reports/oei-05-16-00031.pdf (last viewed April 22, 2019).

[28] *Id.* (citing 350 criminal and civil actions and just \$975 million in investigative receivables for the four years between 2011 and 2015, while estimating more than \$10 billion in improper payments in fiscal year 2015 alone).

billings, certifications, and clinical documentation to protect the integrity of the Medicare Home Health Benefit. MACs are directed by CMS to analyze claims to determine provider compliance with Medicare coverage, coding, and billing rules and take appropriate corrective action when providers are found to be non-compliant. The goal of MAC administrative actions is to correct the behavior in need of change and prevent future inappropriate billing.[29]

59.     Largely due to the volume of Medicare claims, however, CMS and MAC audits are directed at the "provider" and "supplier" level. Medicare defines "provider," in part, as "a home health agency." 42 C.F.R. § 400.202. Therefore, when CMS, MACs or other Medicare auditors issue audits in order prevent non-billable or fraudulent practices and recoup taxpayer money back to the Medicare Trust Fund, those audits are issued to the individual home health agency. Consequently, any resulting overpayment liability owed to Medicare as a result of an administrative audit is owed by the individual agency.

60.     One mechanism used determine provider compliance with Medicare coverage, coding, and billing rules is an "Additional Data Request" ("ADR"). An ADR is issued to a provider when documentation is lacking or the provider has not demonstrated that a claim meets the conditions of payment. In this instance, the reviewer shall solicit documentation from the provider or supplier by issuing an ADR.[30]

61.     "If the MAC, or other Medicare auditor, requests additional documentation to verify compliance with a benefit category requirement, and the submitted documentation lacks evidence that the benefit category requirements were met, the reviewer shall issue a benefit category denial. If the submitted documentation includes defective information (i.e., the

---

[29] Medicare Program Integrity Manual Chapter 3; §3.1

[30] Medicare Program Integrity Manual Chapter 3; §3.2.3 (The term ADR refers to all documentation requests associated with prepayment review and postpayment review)

documentation does not support the physician's certification), the reviewer shall deny the claim as not meeting the reasonable and necessary criteria."[31]

62.     When ADRs are conducted as "post-payment reviews" and the claim is denied, the MAC notifies the provider of an overpayment.  This notice is called a "Review Results Letter." The Review Results Letter includes, among other items: Total overpayment amounts for which the provider or supplier is responsible; an explanation of the procedures for recovery of overpayments, including Medicare's right to recover overpayments and charge interest on debts not repaid within 30 days; and a narrative description of the overpayment situation that states the specific issues involved in the overpayment, as well as any recommended corrective actions.[32]

63.     In addition to ADR audits, CMS utilizes a "Probe and Educate" process to selectively audit and educate providers.  In an initial Home Health-focused Probe and Educate audit, CMS conducted pre-payment reviews of home health claims for episodes that began on or after August 1, 2015.  These initial Probe and Educate Reviews illustrated the majority of claim denials relate to certification requirements, including: "Issues related to the Face-to-Face requirements, including no signature by the certifying physician and encounter notes not supporting all of the elements of eligibility; recertification with no estimate of continued need for service; and recertification denials because the initial certification was missing/incomplete or invalid."[33]

64.     Due to the sheer volume of Medicare claims, MACs must target their efforts to services and items that pose the greatest financial risk to the Medicare program.[34]  For that reason,

---

[31] Medicare Program Integrity Manual Chapter 3; §3.2.3.8

[32] Medicare Program Integrity Manual Chapter 3; §3.6.4.

[33] Centers for Medicare & Medicaid Services; Home Health Medical Review. Available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/Medical-Review/Home_Health_Medical_Review_Update.html

[34] Medicare Program Integrity Manual Chapter 3; §3.2.1

CMS moved from a broad Probe and Educate program to a more targeted one. "When performing medical review as part of Home Health Targeted Probe and Educate (HH TPE), MACs will focus on specific HHAs who have been identified through data analysis as being a potential risk to the Medicare trust fund or who vary significantly from their peers rather than all HHAs."[35] Because Intrepid's company-wide practices cause submission of false claims and threaten the Medicare trust fund, Defendant Intrepid had roughly 20 offices under TPE audit during Relators' tenure with Intrepid.

65.     A TPE audit involves the review of 20-40 claims per round, for a total of up to three rounds of review. Each round of 20-40 claim reviews is referred to as a probe. Providers may be removed from the review process after any of the three rounds of probe review if they demonstrate low error rates or sufficient improvement in error rates, as determined by CMS. Providers/HHAs with continued high error rates after three rounds of TPE may be referred to CMS for additional action, which may include 100 percent prepay review, extrapolation,[36] referral to a Recovery Audit Contractor (RAC), or other action.

### I.  Medicare Certifications – Which Defendant Falsified

66.     To enroll as a Medicare provider, Defendant was required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A. In submitting Form 855A, Defendants made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with

---

[35] *Id.*

[36] Extrapolation can be imposed if a HHA fails all three rounds of a TPE. If imposed, overpayments identified in the audit are statistically extrapolated to represent an accurate representation of the overpayments paid to the home health company—which can result in a substantial administrative liability.

such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

67.     Defendant then billed Medicare by submitting a claim form (CMS Form 1450 for Medicare Part A home health claims, or, more commonly, CMS Form 1500 to for home health claims covered under Medicare Part B) to the Fiscal Intermediary (FI) responsible for administering Medicare home health claims on behalf of the United States. *See* CMS Form 1450; CMS Form 1500. Each time Defendant submitted a claim to the United States through the FI, Defendant certified that the claim was true, correct, and complete, and that it had complied with all Medicare laws and regulations, including but not limited to those cited above.

68.     Further, each time Defendant submitted certifications that a patient was eligible for the Medicare Home Health Benefit, Defendant certified that the patient met all requirements for eligibility. *See* CMS Form 485.

69.     As set forth in detail below, Defendant routinely billed Medicare for home health claims for patients who were plainly and objectively not homebound; did not require skilled services; received duplicative services in Assisted Living Memory Care Units rendering home health services unnecessary; and/or had not been appropriately certified for home health care. Further, Defendant billed for psychiatric care provided by unqualified personnel and billed for excessive and medically unnecessary therapy services and billed for services that were not actually provided. Accordingly, Defendant falsely billed the United States for these home health services. Additionally, Defendant knowingly made false records or statements that were material to getting these false or fraudulent claims paid by Medicare.

## DEFENDANT'S FRAUDULENT SCHEMES

I.    **Defendant Intrepid's Corporate Policies Knowingly Cause the Submission of False Claims**

A. **Intrepid Improperly Incentivizes Sales and Clinical Employees to Admit Home Health Patients, Regardless of Patient Eligibility**

70.    Defendant's fraudulent schemes are implemented through specific directives, intentional corporate structures, and institutionalized pressures designed to manipulate clinical decision-making. First, Intrepid enforces admission quotas to its sales staff—called Account Executives or "Patient Advocates." The account executive's job is to "meet quotas and goals; including meeting the monthly Care Center-targeted Medicare admission goals."[37] If an individual account executive meets their monthly admission quota, they receive a bonus. If the account executive fails to meet their admission quota or if the agency collectively fails to meet its Medicare Admission goals, the account executive would be terminated. Therefore, each individual account executive is highly pressured to reach admissions quotas and, in Relators' experience, generally has no concern for patient eligibility.

71.    Moreover, Intrepid improperly incentivizes clinical employees to admit and recertify home health patients through a "productivity system." Under Intrepid's productivity system, registered nurses and therapists are required to make 25 clinical home health visits per week. If clinical employees exceed 25 visits per week, Intrepid pays them a bonus for each visit over the 25-visit quota. These bonuses are calculated and provided as an additional percentage of the employee's total pay. Similarly, home health aides and licensed practical nurse (LPN) employees are required to perform 30 home health visits per week and are provided with a bonus

---

[37] *Indeed.com; Patient Advocate (Account Executive), Intrepid USA; Marksville, LA.* Available at: https://www.indeed.com/viewjob?jk=ececcbc6a9fe6695&tk=1dr62be0k0mci002&from=title-cmp-salaries

for each visit exceeding their 30-visit quota. If clinicians do not meet their assigned quota of visits, Intrepid re-assigns them to cold-calling and soliciting patients to be re-admitted through the abusive Call-Back Program, discussed *supra*. Clinicians that continually do not meet mandatory productivity quotas are subject to termination.

72. Through this productivity system, Intrepid only pays clinical employees for direct, billable, patient interactions. Clinical employees are not compensated for administrative time, driving time (until and unless the clinician exceeds 400 miles in one week), or mandatory meetings such as Patient Care Conferences.

73. Through Relators' extensive experience in home health, they have never witnessed a pay-scale and productivity system similar to Intrepid's and have knowledge that this system is designed to and does cause the submission of false claims and results in poor patient care. Relators have knowledge that many clinicians succumb to the corporate pressures of the productivity system and support admitting and recertifying non-qualifying patients for home health care and therapy services simply because they need patients to maintain census numbers and make bonuses by exceeding productivity quotas. This dynamic is particularly evident in Intrepid's therapy employees and is a major cause of Intrepid's prolific billing of medically unnecessary therapy services.

74. Further, clinical employees are not paid for administrative time or Patient Care Conferences, which is when discussion and review of patient eligibility is intended to occur. The lack of pay for administrative and compliance tasks is specifically utilized to dissuade clinicians from mounting opposition to the intentional administrative hurdles imposed if a clinician decides to discharge or not admit a patient due to ineligibility. Accordingly, an Intrepid clinician faces a dual-disincentive in deciding not to admit or to discharge a patient: first because they will be in

jeopardy of not meeting their mandated productivity (and potentially forgoing bonus opportunities) and second because they will likely spend hours of their time—for which they will not be paid—battling sales staff in order to exercise their clinical judgment that a patient should be discharged or not admitted.

75.     Perhaps most troubling is the impact that Intrepid's productivity system has on patient care.   By incentivizing the quantity of patient visits performed without giving any consideration to quality of care, Intrepid encourages clinicians to make only cursory home health visits and move to the next patient as quickly as possible.   Relators witnessed this impact and, as discussed *infra*, have knowledge that some clinicians regularly make cursory therapy visits, failing to perform prescribed therapy or even take patients' vital signs.

**B. Intrepid's Corporate Structure is Intentionally Designed to and Results in Sales Department Employees Having Improper Control Over Patient Eligibility Decisions, Causing False Claims to be Submitted**

76.     Intrepid senior management implements both formal and informal processes in the admission, discharge, and recertification of patients that provide the Sales Department and account executives inappropriate visibility and power in clinical patient care and eligibility decisions. Through these processes – designed to facilitate the admission of and billing for ineligible home health patients – Intrepid knowingly causes false claims to be submitted.

77.     The Intrepid admission process generally works as follows: an account executive provides a referral for home health services, which ***should be*** (but often not as discussed *infra*) an order by a physician that a patient be assessed for home health care.   Upon receipt of the order to assess the patient, the agency's administrator and clinical director then review the patient's medical records and send a nurse to the patient's residence to evaluate the patient, perform an OASIS assessment, and assess the patient for Home Health Eligibility.   If the Intrepid staff (the

27

administrator, clinical director, and evaluating nurse) believe the patient is eligible for the Medicare Home Health Benefit, the patient certification and proposed plan of care (the 485) are sent to the certifying physician to sign, and the patient is admitted to Intrepid's home health service.

78.     However, if the clinical staff recommends that the patient not be admitted—typically because the patient is not eligible for the Medicare Home Health Program or because the patient requires more intensive or specialized care than home health can provide—the process is not so straightforward.   In this instance, Intrepid purposely routes the process to the Sales Department to try to coerce, manipulate, or otherwise find a way to have the patient admitted.

79.     Specifically, the Intrepid clinical staff must immediately alert an Executive Sales Director (often Dana Skinner) each time a patient is determined to be inappropriate by clinical staff and not admitted.  Upon being alerted that a patient was not admitted, Ms. Skinner and her sales staff begin a campaign to overrule the clinical assessment and begin incessantly calling the agency administrator and clinical director, asking questions like what "can we do to make this patient appropriate?"  This question is inherently inappropriate and designed to achieve the admission of ineligible patients to home health service. The clinical staff has already determined that the patient is not appropriate and there is nothing a sales person can do that can legitimately change a patient's clinical condition to "make them appropriate."

80.     Common suggestions from the sales staff to "make the patient appropriate" include telling clinical employees to look at further documentation or send another nurse to evaluate the patient.  If clinical employees defend their initial determination and explain why the patient is inappropriate, they meet fierce opposition from sales staff.  Often, sales employees completely circumvent the administrator and clinical staff by calling the non-admitted patient or patient's caretaker and strive to convince the patient that Intrepid home care is in fact the right choice for

the patient, often returning to the clinical staff with "new" information (of highly questionable validity) that sales staff would claim now made the patient eligible. In their operations roles, Relators held steadfast to their clinical determinations against such pressure; however, Relators have knowledge that many Intrepid clinicians and administrators allowed the sales staff to control the admission process—leading to widespread admission of ineligible patients.

81.     Intrepid also tracked the number of patients assessed and determined to be inappropriate through daily data reports, including one metric called "NTUC"—which stands for "Not Taken Under Care." Individuals would be classified as "NTUC" if they were assessed for home health but determined to not be appropriate and not admitted. Senior management, including Mark Spencer, Vice President of Sales, monitored the "NTUC" metrics carefully and regularly questioned and disciplined clinicians whose "NTUC" metrics were considered to be too high.

82.     Intrepid's corporate structure allows and encourages sales employees to exert undue influence over clinical and administrative employees because the sales department corporate structure is effectively a silo of vertical authority: the account executives and other sales employees only answer to more senior sales department employees—not agency administrators or more senior operations managers or clinical managers. This intentional corporate structure emboldens sales employees to defy and circumvent agency administrators, leading to the account executives having improper control over patient eligibility decisions. Relators have knowledge that the sales department "ran the show" in several agencies, including the Brunswick, Georgia and Little Rock, Arkansas agencies.

83.     Relator Watts felt consistently threatened and undermined by sales staff, primarily by Dana Skinner, in the Anniston, Alabama agency. Additionally, in the Montgomery, AL agency, Chief Compliance Officer Bob Parker completely undermined and usurped Relators' authority to

direct clinical appropriateness. In February 2019, Mr. Parker came to the Montgomery agency. After Relators gave a presentation to the staff regarding eligibility requirements and admitting appropriate patients, Mr. Parker stated that "if we want to keep the doors open, we need to grow our census." Mr. Parker went on the suggest that the agency should admit more wound care patients, despite Relators informing Mr. Parker that the agency's staff was not adequately trained in providing wound care. As Relators tried to reiterate that any new admissions must qualify for the Medicare Home Health Benefit, Mr. Parker instructed staff: "If you receive any pushback [related to patient eligibility and clearly directed at Relators], call [Parker] directly." The next month, the Montgomery agency set a new admission record.

84.     Similarly, once patients were admitted to Intrepid home health service, Intrepid corporate management and sales staff improperly directed and manipulated patient recertification decisions. These policies were propounded by CEO John Kunysz and handed down through the sales department. Intrepid set a mandatory quota that each agency should recertify 40 percent of its entire census each month. Having a corporate-wide mandate that all agencies should recertify 40 percent of their patients each month completely contradicts Medicare's requirement of individualized patient care. In addition to the 40 percent recertification requirement, Intrepid management, specifically its sales department employees, mounted opposition to nearly any patient discharges.

85.     As Director of Clinical Excellence, a senior compliance position, Relator Rigney was deeply concerned about the appropriateness of the mandated recertification quotas and opposition to discharges, recognizing that these directives caused inappropriate patients to continue to receive the Medicare Home Health Benefit. Because of these corporate directives, many agencies had extremely long "average length of stay" metrics—which measures how long

the patient has continuously received home health services. When Relator Rigney recognized a given agency had outlier average length of stay metrics, she would supervise an investigation and review patient documentation. Invariably, Relator Rigney would quickly recognize Intrepid was keeping ineligible patients on home health service far longer than medically necessary.

86.     One agency with particularly long average lengths of stay was the Marksville, LA agency. In mid-2018, Relator Rigney reviewed this agency and discovered that the Marksville census had an average length of stay of roughly thirteen 60-day episodes. This means that the average patient admitted to Intrepid Home Health services in Marksville had been receiving taxpayer-funded home health services for roughly two years—with many patients obviously above that average and on service for much longer.

87.     Upon sending a Regional Clinical Specialist to the Marksville agency to review recertification decisions with the agency's administrator, it was apparent that roughly one-third of patients of the Marksville agency census were not appropriate for the Medicare Home Health Benefit and should be discharged. After making these initial discharges and educating staff on appropriate recertification criteria, the recertification rate and length of stay metrics in the Marksville agency decreased from the previous astronomical level.

88.     As Relator Rigney investigated and sought to correct the problems caused by mandated recertification rates on a per-agency basis, she reported concerns to her direct supervisors, Chief Compliance Officer Bob Parker and Vice President of Operations Paul McMullen. Specifically, Relator Rigney informed Parker and McMullen of numerous ongoing compliance issues in Louisiana and Kentucky. Relator Rigney reported these concerns to demonstrate the improper influence of Intrepid's corporate-wide policies, including the mandated recertification rates, and convince her supervisor, as Chief of Compliance, to change these clearly

31

inappropriate policies. These concerns fell on deaf ears, however, as Parker and McMullen claimed they would "look into" Relator Rigney's concerns but in fact took no action and mandated that the corporate-wide recertification rate of 40 percent remained in effect.

89.     Other corporate executives were more open in championing the mandated recertification rates and discouraging discharges. Specifically, CEO John Kunysz and Vice President of Sales Mark Spencer regularly sent emails lamenting that certain agencies were "throttling their census"—meaning they were discharging too many patients. In one such email exchange, Mark Spencer criticized Relator Rigney for the number of discharges in the Valdosta, Georgia agency. These Valdosta discharges came as result of Relator Rigney uncovering the years of improper management and ineligible patients under Administrator Candace Kicklighter. In response, Relator Rigney informed Mr. Spencer that she would continue to discharge patients that were not appropriate for the Medicare Home Health Benefit.

90.     A common tactic that Intrepid used to deter discharges and increase recertification was the imposition of "punishment work." In order to discharge a patient, clinical staff were required to provide detailed justifications supporting their recommendation of discharge. These justifications were typically subject to intense scrutiny—primarily from sales staff. In contrast, Intrepid management required no justification and imposed no attendant scrutiny on clinical staff who decided to admit or recertify a patient. Intrepid thus strongly incentivized the clinical decision that resulted in corporate profit. Relators witnessed many clinicians simply recertify patients that should have been discharged to avoid the scrutiny and extra work—extra work that clinicians were not being paid to perform under Intrepid's "productivity" compensation system.

91.     Since Relators' termination in retaliation for their opposition to Intrepid's policies and submission of false claims, the corporate clinical compliance team has increased its oversight

over recertification decisions. Spearheaded by Chief Compliance Officer Bob Parker and Director of Clinical Excellence Carolyn Williams, certain offices have been brought under the control of a "Recertification Decision Team."

92.     The Recertification Decision Team is made up of remote employees who review documentation of patients nearing recertification and dictate to the agency which patients should be recertified. The Recertification Decision Team purports to make the recertification decision—often overruling clinicians in the field—without actually seeing the patients or conversing with the nurses and aides who actually visit the patients. Moreover, Relators have knowledge that the recertification decision team knowingly recertifies ineligible patients for the Medicare Home Health Benefit. In one such example in the San Angelo, TX agency, the Recertification Decision Team required the agency to recertify a patient who clearly had no skilled need, had no medication changes, and was known by Intrepid staff to simply wish to remain on home health service to receive visits from a home health aide. In spite of those facts—and the fact that this particular patient had been on Intrepid's home health service for five years—the patient was ordered to be recertified by the Recertification Decision Team.

### C. Intrepid's Institutionalized Improper Solicitation of Recently Discharged Patients, Which Causes False Claims to be Submitted

93.     When a patient is discharged from Intrepid's home health services, Intrepid solicits and seeks to re-admit the patient—who typically has only just been determined by Intrepid clinicians to be inappropriate for home health services and discharged over significant opposition. This practice of "cycling patients" on and off home health service is used by Intrepid to avoid scrutiny which can be caused by long lengths of stay and keep a steady stream of repeat referral patients returning to Intrepid—often despite not qualifying for the Medicare Home Health Benefit. Intrepid achieves this scheme through its "Call-Back Program."

94.     Under the Call-Back Program, Intrepid generates a Discharge Report from the Kinnser Electronic Medical Record program on the first working day of each month that displays all patients discharged within the past 120 days.  Intrepid then designates employees—both clinical and sales employees—to cold call these recently-discharged patents and solicit the patient or their caregiver to resume home health services with Intrepid.  Intrepid claims that the objective of the Call-Back Program is to "ascertain the patient's condition after discharge and to measure his/her overall satisfaction."

95.     Intrepid's very transparent claim that the purpose of the Call-Back program is to ascertain patient satisfaction is belied by Intrepid's outsourcing of actual patient satisfaction surveys to a third-party company called Deyta.  With Deyta performing actual patient satisfaction surveys, it is apparent that the sole purpose of the Intrepid Call-Back program is to improperly solicit and re-admit patients—many of whom are not eligible for the Medicare Home Health Benefit.

96.     In reality, Intrepid Management pressures and improperly incentivizes both clinical and sales employees to aggressively solicit patients recently discharged through the Call-Back Program.  One method of doing so is to hold contests to provide remuneration to staff who procure referrals through the call-back program.  For instance, if an Account Executive met specific Call-Back Program referral goals, $250 would be loaded onto that Account Executive's Intrepid "Pay-Card."

97.     Each Intrepid employee—clinical and non-clinical—is provided an Intrepid "Pay-Card."  The Intrepid Pay-Card is a Visa or MasterCard credit card with funds remotely loaded onto it by Intrepid's Corporate Headquarters.  Relators have knowledge that the primary purpose of these corporate Pay-Cards is to provide cash-equivalent incentives to employees.  Intrepid also

loaded cash onto Pay-Cards issued to agency administrators, which they used to throw parties and buy items such as new scrubs for employees when the agency met certain goals—such as agency Call-Back program goals.

98.     Conversely, if an agency is not meeting its Call-Back Program goals, the administrator and staff are subject to discipline. Intrepid mandates that ten percent of all patient referrals are to come from the Call-Back Program. If this quota is not met, the administrator of the agency is required to attend mandatory conference calls—often intentionally scheduled at 7:00 AM to further punish the administrator. On these mandatory calls, administrators deemed not to be meeting Call-Back program goals are threatened, demeaned, and intimidated and coerced to more aggressively solicit recently discharged patients for re-admission. Kathy Bingham, an Intrepid Corporate Sales and Operations Analyst, is particularly aggressive in coercing administrators and staff to vigilantly solicit patients through the Call-Back Program and sends daily emails touting the remuneration available for meeting program goals, lauding agencies and employees that were procuring extraordinary referrals through the Call-Back program, and/or threatening discipline for those not meeting Call-Back quotas.

99.     Multiple Intrepid managerial employees, including Relators, raised concerns about the clear impropriety of the Call-Back Program. One such managerial employee was Donna Smith, who as Vice President of Operations attempted to discontinue the Call-Back Program because of the clear compliance concerns. However, based on Ms. Smith's adherence to compliance, she was retaliated against and blamed for reduction in business—leading her to resign from Intrepid in December 2018. Relators suspect that many Intrepid agencies never discontinued the Call-Back Program and that, without substantial opposition from Ms. Smith, the inappropriate Call-Back Program was openly revitalized.

**D. Intrepid Corporate and Middle Management Fails to Disclose and Intentionally Hides Patient Abuse, Neglect, and Evidence of False Claims**

100.    As part of toxic corporate culture described herein, Intrepid overlooks, fails to disclose, and intentionally hides damaging reports.  This troublesome practice fails to discipline Intrepid employees who are known to be a danger to patients, fails to prevent future patient harm, and contributes to the submission of false claims—specifically, false claims for services that were never provided.

101.    Relator Watts witnessed this practice when assuming her duties as an administrator in the Montgomery, AL agency.  Ms. Watts discovered that the Intrepid Corporate Office had instructed staff to keep client grievance complaints in separate, secret folders that would not be disclosed to State auditors in accordance with Quality Assurance and Performance Improvement (QAPI) requirements and not even in offending employees' personnel files.

102.    One example of the disastrous impacts from secluding such information occurred when Relator Watts received a client complaint that an Intrepid physical therapist had sexually assaulted a patient.  When Relator Watts confronted the offending employee, the physical therapist admitted to the alleged assault.  Extremely disturbed, Relator Watts insisted that the therapist be fired.  Shockingly, Intrepid's corporate Human Resources department - specifically Human Resources employee Kyle Green - refused to allow Relator Watts to terminate this employee, stating that "some women like that." Moreover, Relator Watts discovered through conversations with Intrepid staff that this therapist had been previously accused of sexually assaulting patients. Due to Intrepid's corporate policy of secluding negative reports, there was no record of the past complaints in the QAPI data or even in the therapist's personnel file to forewarn Relator Watts about a known predator.

103.    Later, in June 2019, when Relator Watts was in a corporate compliance role surveying the Elizabethtown, KY Intrepid agency, she learned that administrators in that agency also intentionally secluded patient complaints and evidence of fraud.  Specifically, as detailed *infra*, the Murray agency hid Patient Grievance Reports in which patients complained that they did not receive legitimate services, but only superficial therapy visits and evaluations.

104.    Also in secluded folders in the Elizabethtown, KY agency records, Relator Watts discovered stacks of pre-signed visit notes.  These pre-signed visit notes were signed by patients but otherwise blank.  Relator Watts inquired about these visit notes, did not receive a clear answer, and, in response, told Kentucky Administrators that requesting patients pre-sign stacks of visit notes was impermissible and that the electronic system should be used for all visit notes.  The implication is clear: Intrepid employees were coercing elderly patients into signing multiple blank visit notes at once so that Intrepid could forgo providing required care to patients while still billing the Medicare system as though care was provided.

105.    Such blatant fraudulent and harmful activity could only be perpetrated by a wholly corrupt organization like Intrepid.

## II.    Defendant Intrepid U.S.A.'s False Claims

### A.  False Claims for Non-Qualifying Patients.

106.    Through Relators' experience as both operations managers and clinical compliance employees, Relators have knowledge that Defendant Intrepid routinely admitted and recertified non-qualifying and non-homebound patients for the Medicare Home Health Benefit.

107.    Relator Watts was employed as the administrator of the Birmingham, AL; Anniston, AL; and Montgomery, AL Intrepid agencies from August 2017 to March 2019.  As administrator, Relator Watts was the primary managerial employee of each of these agencies and

responsible for the agencies' operations, clinical, and compliance functions. Upon assuming this role, Relator Watts quickly recognized that many of the patients in these agencies were inappropriate for the Medicare Home Health Benefit. Specifically, in late 2017, after Regional Manager Chris Roller left Intrepid due his disagreement with the company's handling of compliance issues (specifically the therapist sexual assault issue described *supra*), Intrepid's then-CEO Paul Foster came to Birmingham, AL to try to stabilize the agency amid chaos and turnover.

108.    During this visit, Relator Watts raised several concerns, specifically that numerous staff members were inadequately trained to assess eligibility and that many of the patients on the Birmingham agency's census were clearly ineligible for the Medicare Home Health Benefit. Generally, most of the patients on the Birmingham agency's census at this time had very long lengths of stay and Intrepid was essentially providing "custodial" care—meaning the patients had no change in their condition over many months or even years, did not have a need for skilled care, and were exclusively visited by home health aides to largely perform housekeeping and unskilled medical care such as checking blood pressure. Additionally, most of the Birmingham agency's patients were not homebound and were able to and routinely did leave home.

109.    Intrepid had knowledge that many of the Birmingham patients were not homebound because they were regularly not at home at the time of their pre-scheduled home health visits. After discussing and reviewing the largely ineligible patient population of the Birmingham agency with Relator Watts, Mr. Foster - the CEO of Intrepid - acknowledged the pervasive ineligibility, stating "well we can't discharge everyone at once."

110.    One example of a "custodial" patient on census in the Birmingham agency known to not qualify for the Medicare Home Health Benefit is Patient W.M. Patient W.M. was diagnosed with cerebral palsy, yet was a chronic patient without changes in his condition. Patient W.M. was

not homebound and would routinely leave home to run errands with his step-sister caretaker. The only health care service provided by Intrepid was to change Patient W.M.'s gastronomy tube (G-tube). An Intrepid home health aide would also visit Patient W.M. periodically to give him a bath. Patient W.M. routinely left home to for visits to his physician's office, where a G-tube change could have been easily and regularly performed. At this time, in late 2017, Patient W.M. had been on the Birmingham agency's census for roughly four years. Relator Watts recommended that Patient W.M. be discharged from home health care because Patient W.M. was clearly ineligible for the Medicare Home Health Benefit. Shockingly, CEO Paul Foster personally over-ruled Relator Watts, ordering her to continue billing Medicare for home health services provided to Patient W.M. Foster justified his decision on the basis that Intrepid's Birmingham patient census was so collectively inappropriate that "they could not discharge everyone at once." After Foster's fraudulent directive, Intrepid continued to submit false claims to Medicare for Patient W.M. for at least one more certification period in December 2017 - January 2018.

111. At Relator Watts' insistence and with support of Relator Rigney, who became the Regional Director over the Birmingham agency in April 2018, Intrepid's Executive Management allowed Relators to slowly discharge nearly half of the Birmingham agency's census because these patients were inappropriate for the Medicare Home Health Benefit. However, this discharge process took several months and Intrepid did not refund Medicare for any home health services provided to known ineligible patients—which made up the majority of the services provided by the Birmingham agency for years.

112. When Relator Rigney assumed the responsibilities as Regional Manager of Operations over Intrepid's operations in the Southeast United States, Relator Rigney discovered

widespread ineligible patients being billed under the Medicare Home Health Benefit under conditions similar to those described in Birmingham.

113.    One agency where Relator Rigney recognized significant problems was in Valdosta, GA.  The Administrator of the Valdosta agency, Candace Kicklighter, had implemented a pattern and practice of admitting Medicare patients when the patients were clearly ineligible for the Medicare Home Health Benefit.  Moreover, in patient care conferences in which clinicians are supposed to discuss and provide clinical opinions as to patient eligibility, Ms. Kicklighter, who has no clinical training, regularly overruled clinicians who actually assessed the patients, ordering that ineligible patients be admitted. Moreover, Ms. Kicklighter was known to alter patient records and clinical assessments to manipulate patient OASIS assessments.  Although Relator Rigney ultimately terminated Ms. Kicklighter in the summer of 2018 for failure to comply with Relator Rigney's instructions to remedy her pattern and practice of admitting and re-certifying ineligible patients, Intrepid undertook no effort to assess its liability or undertake efforts to repay Medicare.

114.    As Relators moved into corporate compliance roles and gained a wider view of Intrepid's operations, they both recognized widespread problems.  In one instance, Darlene Douglas, a corporate compliance reviewer—who worked under Relator Rigney and was Relator Watts' counterpart—was reviewing patient charts from the Valdosta, GA agency and discovered that in April 2019, a nurse documented that a female home health patient certified as homebound was driving her vehicle alone, ran out of gas, and walked over 1,000 feet to get gas.  Upon Ms. Douglas's showing this information to Relators, an in-depth review of the patient's chart was performed and Relators discovered that this patient was clearly ineligible for the Medicare Home Health Benefit.  Relators recommended that this patient be discharged. While it is believed that patient was ultimately discharged, Intrepid did not undertake any effort to repay Medicare. This is

40

just one of numerous examples of ineligible patients admitted under Intrepid's top-down pressure and particularly under Ms. Kicklighter's directed fraud in the Valdosta agency.

115.    The Intrepid agency in Memphis, TN was another agency rife with ineligible patients.  Relator Watts was assigned to be the clinical compliance reviewer in this office.  One striking example of the widespread non-homebound patient population in this office was that of a male patient with lower leg ulcer as his admitting diagnosis.  In June 2019, when Relator Watts reviewed his chart, this patient had received home health services for roughly six months—or three home health certification periods.  This patient triggered an inquiry from Relator Watts as clinical reviewer because the patient's lower leg ulcer, which was his admitting diagnosis, was documented as healed for the past two certification periods.  Upon review of this patient's chart, Relator Watts quickly realized that this patient was not homebound and thus not qualified for the Medicare Home Health Benefit because it was documented that this patient would routinely miss therapy visits to take his wife shopping.  Therefore, this patient did leave his home on a regular basis without considerable or taxing effort and for reasons unrelated to his medical care.  Moreover, on at least one occasion when the Intrepid home health nurse arrived to provide a visit, the patient was using a push lawn mower to mow his lawn.  Nonetheless, Intrepid falsely billed Medicare for services purportedly provided to this ineligible patient.

116.    Similarly, in her review of the Murray, KY and Elizabethtown, KY agencies, Relator Watts discovered numerous ineligible patients receiving home health services under the Medicare Home Health Benefit.  These patients include:

a.  Patient B.B; Murray, KY agency.  Relator Watts reviewed Patient B.B.'s chart, visited Patient B.B. at home, and quickly determined that Patient B.B. was not eligible for the Medicare Home Health Benefit.  At that point, in May 2019, Intrepid had been billing Medicare for home health services purportedly provided to Patient B.B for six years. Yet, the only service being provided to Patient B.B. was a bath from Intrepid Home Health aides twice a week.  Patient B.B.'s admitting diagnosis noted that he had a lower

leg ulcer, requiring wound care. However, Relator Watts has knowledge that this wound had long since healed and Patient B.B. was simply receiving unskilled home health aide services. Relator Watts recommended that Patient B.B. be discharged as inappropriate for the Medicare Home Health Benefit. However, while it is unknown whether Patient B.B. was actually discharged based on this recommendation, Relator Watts does know that there was no effort to repay Medicare for years of non-billable services that had been billed for Patient B.B.

b. Patient J.B; Elizabethtown, KY agency. Relator Watts reviewed Patient J.B.'s chart, visited this patient at home with Intrepid clinicians, and quickly determined that Patient J.B. was not homebound and not eligible for the Medicare Home Health Benefit. Patient J.B. informed Relator that he had just returned from an out-of-town vacation with his children. Further evidence of Patient J.B.'s lack of homebound status was his routinely missing of home health and therapy visits because he was frequently and regularly away from home. Due to Patient J.B. not being homebound and not requiring the skilled services he was purportedly being provided, Relator Watts recommended that Patient J.B. be discharged as inappropriate for the Medicare Home Health Benefit. However, while it is unknown whether Patient J.B. was actually discharged based on this recommendation, Relator Watts does know that there was no effort to repay Medicare for the non-billable services that had been billed for Patient J.B.

c. Patient R.R; Elizabethtown, KY agency. Relator Watts reviewed Patient R.R.'s chart, visited Patient R.R. at home with Intrepid clinicians, and quickly recognized that Patient R.R. did not have a skilled nursing or therapy need. The purported skilled need for which Patient R.R. had been admitted to Intrepid Home Health Service was related to "education." However, Patient R.R. had been receiving home health services for roughly nine months (five certification periods) which was more than enough time to educate Patient R.R. Relator Watts noted that Patient R.R. should have been discharged because any legitimate education would have been completed at least two certification periods prior. Therefore, Relator Watts recommended that Patient R.R. be discharged as inappropriate for the Medicare Home Health Benefit. However, while it is unknown whether Patient R.R. was actually discharged based on this recommendation, Relator Watts does know that there was no effort to repay Medicare for the non-billable services—at least two 60-day certification periods—that had been billed for Patient R.R.

**B. Defendant Intrepid USA Knowingly Bills Medicare for Duplicative and Medically Unnecessary Home Health Services Purported to be Provided to Patients Residing in Facilities, or a Distinct Part of a Facility, that Provides Full Nursing Care to Patients.**

117. Due to the unrelenting pressure to admit and recertify patients for home health services, regardless of eligibility for the Medicare Home Health Benefit, several Intrepid Agencies

42

operated through a pattern and practice of soliciting and enrolling patients residing in assisted living facilities (ALFs) for home health services. Many of these ALF patients have full access to skilled nursing or health aide services through the staff at the ALF where the patient resides. Therefore, skilled nursing or home health aide services provided to these patients by Intrepid are non-billable because such services are duplicative of nursing services available through the patient's ALF.

118. The ALF duplicative care billed by Intrepid is most apparent for patients residing in "Memory Care Units" within ALFs. Memory Care Units usually exist as a wing or separate portion of an ALF or nursing home and are designed to care for patients with Alzheimer's disease and related dementia conditions who require higher levels of skilled care and supervision. To care safely for this patient population, Memory Care Units are usually locked and require special access to enter. Patients in Memory Care Units are cared for by 24-hour nursing staff specifically trained in Alzheimer's and memory care who provide all patient nursing needs.

119. Moreover, much of the skilled care purported to be provided by Intrepid is not reasonable or medically necessary for patients in Memory Care Units. A significant percentage of home health skilled nursing care is tied to "education," whereby a home health nurse educates patients on how to better care for themselves, such as teaching what Intrepid refers to as a "home exercise program." Because patients in Memory Care Units are suffering from Alzheimer's and dementia – often at the later stages of these diseases – these patients are not able to retain new information and learn how to care for themselves. Furthermore, these patients have 24-hour specially trained nursing staff to care for the patients—rendering self-care not only unfeasible but unnecessary.

120.     Medicare guidelines regarding whether patients residing in ALFs are eligible to receive home health services provide: "Services to people who already have access to appropriate care from a willing care giver would not be considered reasonable and necessary to the treatment of the individual's illness or injury."[38]  Patients residing in ALFs that provide skilled nursing services – and certainly patients residing in Memory Care Units – have access to appropriate nursing care.  Accordingly, any home health nursing services or home health aide services would clearly be duplicative and medically unnecessary because these patients already have access to appropriate care and do not require taxpayer-funded home health services.

121.     When Relator Rigney assumed the role of Regional Director of Operations, she recognized that several Intrepid agencies had built their entire patient census around assisted living and Memory Care patients.  One such agency was the Brunswick, GA agency and its Kingsland, GA satellite agency.  During the summer of 2018, Relator Rigney reviewed operations and referral sources in the Brunswick, GA agency and recognized that the marketing staff had developed a pattern and practice of recruiting ALF patients and specifically patients in Memory Care Units.  Specifically, Brunswick marketing staff Susan Massey regularly procured referrals and admissions of Memory Care Unit patients and complained to Relator Rigney when instructed to cease this practice, stating "that's a lot of the business we've always brought."  In response, Relator Rigney replied "that's because no other home health agency will take these patients [because providing home health services to patients in locked Memory Care Units was obviously duplicative care and non-billable]."

122.     Relator Rigney notified then-Vice President of Operations Donna Smith that a significant percentage of the patients cared for by these agencies were residing in ALFs and

---

[38] Medicare Benefit Policy Manual Ch. 7 § 30.1.2.

Memory Care Units within ALFs and were therefore inappropriate for home health nursing and aide services. Ms. Smith concurred that these patients already had access to skilled nursing care, were inappropriate for the Medicare Home Health Benefit, and should be discharged. Specifically, Relator Rigney and Ms. Smith instructed the Brunswick and Kingsland offices and sales staff to cease procuring patients from ALFs and specifically from Memory Units within ALFs, telling them to "look elsewhere for patients." Nonetheless, Intrepid undertook no effort to repay Medicare for years of duplicative home health services provided to assisted living and Memory Care patients.

123. Despite these instructions, and demonstrating the sales department's reckless autonomy, the sales staff in Brunswick – specifically Account Executive Susan Massey – continued to recruit and enroll patients in Memory Care Units in Intrepid's Home Health Care. Upon discovering these fraudulent practices were defiantly ongoing, Relator Rigney re-emphasized to the Brunswick agency that it should not solicit or enroll patients residing in Memory Care Units because these patients were inappropriate for home health and billing claims related to these patients was fraudulent.

124. As Relators moved into corporate roles, they recognized that the issue with skilled nursing assisted living patients and specifically Memory Care patients was a nationwide issue. In June 2019, Relator Watts was reviewing operations in the Murray, KY Intrepid agency and its satellite agencies and discovered that that agency also regularly solicited and enrolled ALF and Memory Care patients for duplicative home health services. Upon reviewing these ALF patients in Kentucky and the skilled services provided at their residential facilities, Relator Watts reported that these patients were receiving duplicative care and should be discharged. In one example, a patient was enrolled in home health care for the purpose of providing wound care in spite of the fact that the nursing staff in the facility was capable of providing and often did provide the patient's

wound care. Frequently, the facility's nursing staff had already appropriately cared for this patient's wounds before the Intrepid home health nurse arrived. On such occasions, Intrepid would not provide any skilled care but, nonetheless, bill Medicare as though skilled wound care had been provided.

125.     As Relator Watts' supervisor, Relator Rigney reported these specific non-billable and non-qualifying patients to Bob Parker, Chief Compliance Officer. Mr. Parker responded that he "would look into it" but took no meaningful action. Soon thereafter, both Relators were terminated for their efforts to prevent false claims from being submitted, including this reporting of duplicative care being billed in the Murray, KY agency. Therefore, Relators believe that Intrepid did not follow their recommendations to discharge these inappropriate ALF patients, but continued to submit false claims for non-billable home health services.

## C. Defendant Intrepid USA Knowingly Bills Medicare for Home Health Services That Were Never Provided.

126.     The corporate culture of Intrepid breeds fraud. Malfeasance starts at the top of the organization and permeates to the front-line employees responsible for patient care. Because Intrepid's pay-structure for clinical employees only compensates based on volume of patients seen and places zero value on the quality of patient outcomes, Intrepid clinicians often make cursory clinical visits performing no meaningful care or therapy but bill as though they provided legitimate services to the patient. Moreover, as referenced *supra*, many agency administrators and mid-level managers knowingly permit this conduct and shield unscrupulous clinicians from scrutiny by concealing patient complaints. Finally, when evidence of this fraud and patient neglect is discovered, corporate officers of Intrepid condone such practices and knowingly profit from clinicians falsely reporting services provided.

127.   In June 2019, Relator Watts was reviewing operations in Intrepid's Elizabethtown, KY agency and discovered several "Client Grievance/Complaint Reports" made by the patients and their families that Occupational Therapist Mark Hillard was not performing prescribed occupational therapy (OT) sessions but instead making cursory visits to patients' homes and leaving without performing any meaningful therapy services.

128.   Relator Watts also discovered that management intentionally hid these Complaint Reports, finding the Complaint Reports in Mr. Hillard's personal employee file and not in a designated Complaint folder available to State licensure auditors, as required by Intrepid's QAPI program. The following are examples of hidden Client Grievance/Complaint Reports demonstrating that Intrepid Occupational Therapist Mark Hillard was not performing prescribed OT evaluations for which Intrepid nonetheless knowingly billed:

(a) Patient E.W. was scheduled to have an OT evaluation performed by Occupational Therapist Mark Hillard on March 27, 2019. However, Patient E.W. reported to Intrepid that Mark Hillard's evaluation visit was "a joke." Clinical Supervisor Christy Aubrey spoke with Patient E.W. two weeks after the visit on April 9, 2019 and noted that Patient E.W. told her that "no vital signs were obtained by Mark and no exercises were performed." "Patient reports Mark watched him use the stretch band for a few minutes, then left. Patient reports it was a waste of everyone's time," Ms. Aubrey wrote. However, the "Result of the investigation/findings" was documented by Ms. Aubrey as "OT eval complete on 3/27/19 has vital signs and complete eval. assessment documented" but provides no other explanation. Intrepid took no action to "prevent reoccurrence," and no "resolution" was provided. The patient's account of the cursory evaluation visit and the documentation clearly do not match, yet Intrepid did not perform any legitimate investigation. Further, Intrepid billed Medicare for this evaluation service despite its not being performed, and did not refund Medicare after being alerted to this fraud by Relator Watts. Even more troubling, Patient E.W. was prescribed, and Medicare was billed for, an entire episode of home health OT services based on this clearly deficient evaluation. Therefore, all such therapy services billed because of this faulty evaluation are false claims.

(b) Patient N.C.'s family reported that Occupational Therapist Mark Hillard did not obtain vital signs or ambulate patient to bathroom to complete an OT evaluation, which was

supposed to occur on March 18, 2019. Again, on April 9, 2019, Clinical Supervisor Christy Aubrey contacted Patient N.C.'s daughter, who confirmed that Mr. Hillard "did not take her mother's vital signs or perform any transfer during his visit and that [Mr. Hillard] looked at their bathroom twice but did not watch patient perform any ADL [Activity of Daily Living] functions." Intrepid took no action to "prevent reoccurrence" and no "resolution" was provided. Again, Ms. Aubrey was satisfied with Mr. Hillard's falsified documentation by concluding her investigation because "OT eval dated 3/18/19 has vital signs and complete eval assessment documented." Relator Watts has knowledge that Intrepid billed Medicare for this service despite its not being performed, and did not refund Medicare after being alerted to this fraud by Relator Watts. Further, Patient N.C. was prescribed, and Medicare was billed for, an entire episode of home health OT services based on this clearly deficient evaluation. Therefore, all such therapy services billed because of this faulty evaluation are false claims.

(c)   Patient T.C. reported to another Intrepid Clinician that Occupational Therapist Mark Hillard did not obtain her vital signs or get her up during her OT evaluation that was supposed to be performed on March 28, 2019. Two weeks later, on April 9, 2019, Clinical Supervisor Christy Aubrey called the patient who confirmed that Mr. Hillard did not take her vital signs and Mr. Hillard simply asked the patient to "squeeze his hands and asked how she does getting on and off the toilet and in and out of a wheelchair." Intrepid took no action to "prevent reoccurrence" and no "resolution" was provided. However, again despite a clear pattern of Mr. Hillard regularly not performing legitimate occupational therapy evaluations or even taking patient vital signs, Ms. Aubrey was satisfied because Mr. Hillard falsely reported his assessment documentation, finding: "OT eval completed on 3/28/19 has all assessment areas complete and vital signs documented." Relator Watts has knowledge that Intrepid billed Medicare for this service despite its not being performed, and did not refund Medicare after being alerted to this fraud by Relator Watts. Patient T.C. was prescribed, and Medicare was billed for, an entire episode of home health OT services based on this clearly deficient evaluation. Therefore, all such therapy services billed because of this faulty evaluation are false claims.

**D.  Defendant Intrepid USA Knowingly Bills Medicare for Home Health Therapy Services that are Medically Unnecessary.**

129.   Intrepid habitually bills the Medicare program for excessive and medically unnecessary therapy services. Intrepid's corporate policies incentivize therapy employees to

maximize therapy utilization – regardless of medical necessity – causing medically unnecessary and over-utilized therapy to be pervasive throughout Intrepid's nationwide operations.

130.    Specifically, medically unnecessary therapy was identified as a major problem in the following Intrepid agencies and their satellite agencies: Raleigh, NC; Charleston, SC; Memphis, TN; and Little Rock, AR.

131.    To minimize scrutiny and easily discoverable over-payments, Intrepid instituted a pre-billing review of all therapy claims in offices that were currently under TPE audits. These limited pre-bill therapy reviews – which were generally performed legitimately by Compliance employees Robert Taylor Powell and Sean Kelly – determined that much of the therapy provided by Intrepid therapists was medically unnecessary and recommended not to be billed to Medicare. However, despite the Compliance employees identifying non-billable claims and recommending that these claims not be billed, Intrepid regularly billed Medicare for such claims, thereby knowingly submitting false claims for payment.

132.    Tellingly, Intrepid did not institute a pre-bill review in offices where widespread, medically unnecessary therapy was known to Intrepid internally, but not discovered by MAC auditors.  Relators have knowledge through Operations Management Employee Kathy Garza in Little Rock, AR that the Little Rock agency and its satellite agencies regularly submitted claims for medically unnecessary therapy.  However, due to the significant therapy over-utilization and revenue from these false claims, the Little Rock agency was very profitable for Intrepid.  Because of revenue derived from fraud, Intrepid decided to not "rock the boat" in Little Rock and did not institute a pre-payment therapy review in this office.  Consequently, Intrepid continued to submit false claims for medically unnecessary therapy in the Little Rock agency, despite knowledge that fraud was rampant.

133.    Relator Watts has specific knowledge of therapy fraud in the Elizabethtown, KY agency.  In one example, Medicare was billed for therapy services purportedly provided to Patient J.B.  However, upon reviewing this patient's chart and visiting and evaluating Patient J.B., Relator Watts discovered that not only was Patient J.B. not homebound and therefore ineligible for the Medicare Home Health Benefit, but also that the physical therapy billed for Patient J.B. was medically unnecessary because Patient J.B. no longer needed skilled therapy services.

134.    Similarly, Patient R.R. in the Elizabethtown, KY agency was prescribed -  and Medicare was billed for – significant physical therapy services.  However, upon assessment of Patient R.R. and review of his chart, Relator Watts realized that Patient R.R. was not able to perform much or any of the therapy services purportedly being provided.  Moreover, Patient R.R.'s therapy goals were completely unachievable for a patient in his declining condition, whom Relator Watts believed was more appropriate for hospice care—not home health care and certainly not home health care with a very aggressive physical therapy plan of care.  Therefore, the significant physical therapy services billed for Patient R.R. were medically unnecessary, non-billable, and represent false claims for payment.

### E.   Defendant Intrepid Bills Medicare for Home Health Care Provided to Psychiatric Patients but Does Not Employ Required Specialized Psychiatric Nursing Staff, Thereby Submitting False Claims.

135.    To meet corporate admission quotas, Intrepid admits patients who require specialized care that Intrepid home health services is not able to provide.  Specifically, patients with serious psychiatric diagnoses were actively solicited by Intrepid through psychiatric-focused marketing campaigns.  Intrepid developed and implemented this program despite knowledge that Intrepid did not employ specialized psychiatric nurses as required to provide legitimate psychiatric

home health care.[39]   Thereafter, Intrepid enrolled a significant number of psychiatric patients in home health services and submitted false claims for services purported to be provided to these patients.

136.    Through Relators review of the Murray, KY agency in May 2019, Relators discovered that the Kentucky agencies were actively selling patients, care givers, and health care providers a false psychiatric "program" that Intrepid purported to provide, despite not employing any nursing staff that would meet the specialized qualifications to legitimately provide psychiatric home health care.  Nurses then – without any psychiatric training – would perform psychiatric evaluations, admit the patient to home health services, and alter vulnerable patients' psychiatric care regimens.  Moreover, Intrepid nurses – without psychiatric training – would routinely administer powerful psychiatric drugs to patients, including intramuscular (IM) psychiatric medications.  IM psychiatric medications are injectable formulations of psychiatric drugs used to treat psychiatric conditions such as schizophrenia, psychosis, and bi-polar disorder.

137.    Upon discovering these practices, Relators instructed the Kentucky agencies to refrain from marketing to, admitting, and treating psychiatric patients.  Relator Rigney also found printed marketing materials specially designed to assist in the solicitation and admission of psychiatric patients—whom Intrepid was not qualified to treat.  Relator Rigney brought these non-compliant printed materials directly to Chief Compliance Officer Bob Parker and explained the troubling, dangerous, and non-billable care ongoing in Kentucky.  As with other concerns brought by Relator Rigney, Parker ignored her and took no action.

---

[39] Local Coverage Determination (LCD): Home Health – Psychiatric Care (L34561): Palmetto GBA. Available at: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=34561 (Palmetto GBA is the Home Health MAC for the following states: New Mexico, Texas, Oklahoma, Louisiana, Arkansas, Illinois, Indiana, Ohio, Kentucky, Tennessee, Mississippi, Alabama, Georgia, Florida, South Carolina and North Carolina.)

**F. Defendant Intrepid Knowingly and Improperly Avoids Obligations to Pay Money to the United States.**

138.   Defendant Intrepid habitually submits false claims for payment, rendering it an outlier among home health companies.  Therefore, Medicare and MAC auditors have identified several Intrepid agencies as posing a specific threat to the integrity of the Medicare program and issued numerous audits to Intrepid through both the ADR audit process and the TPE audit process. Specifically, Relators estimate that roughly 20 Intrepid Agencies were issued TPE audits during Relators' tenure with the company.

139.   Once Intrepid is audited, and a MAC auditor reviews Intrepid's patient records, the fraud described herein is often apparent.  Therefore, Intrepid agencies under audit typically amass significant overpayment liability—which is owed to the Medicare Program.  Instead of repaying hundreds of thousands of dollars in overpayments to the taxpayer-funded Medicare system, focusing on appropriate care and not falsely billing the government, Intrepid simply closes shop and tries to walk away from its debt.

140.   Intrepid, along with its outside consultant Corridor Group, has implemented this scheme so often that it refers to it by a specific term: "Mothballing."  The "mothballing" of the Birmingham, AL agency serves as an example of how this scheme works.  The Birmingham agency was placed under ADR audit in May 2018.  Specifically, CMS auditors requested five patient charts from the Birmingham agency.  Initially, Intrepid simply ignored the request.  Soon after, Relator Watts received a certified letter re-requesting the five patient charts of patients who were on census prior to Relator Watts' employment with Intrepid.  Despite scouring the agency's records, she was only able to find two of the five charts; those two patients were denied and repayment requested.

141.   Because of failure of the ADR audit, the Birmingham agency moved to a TPE audit; approximately 20-40 patients were selected for Round One of the TPE audit.  Unsurprisingly, the Birmingham agency failed Round One of this TPE audit and the MAC auditors assessed the Birmingham agency with $170,000 in overpayment liability.  Faced with paying back this liability and in the midst of its "education" of how to avoid submitting non-billable claims, Intrepid elected to "mothball" the agency in late March 2019.  At this time, Intrepid discharged all patients on census and terminated all staff.  Intrepid was very careful in its terminology and repeatedly assured staff that they were not closing the Birmingham agency but, rather, "winding it down."

142.   The importance of "winding down" the Birmingham agency and not closing it is that Intrepid kept the home health license for the agency active, despite not having any staff or patients, as it tried to find a buyer for the agency.  Intrepid even attempted to steer patients to a specific competitor – ProHealth Home Health and Hospice (ProHealth) – after discharging the patients from Intrepid, because it believed ProHealth might be a potential purchaser of the Birmingham office's HHA provider license.

143.   This complete abandonment of patients for whom Intrepid is responsible has also resulted in patients being unable to reach anyone in the "mothballed" Intrepid agencies, even for administrative issues like getting medical records to provide to current providers—causing patients and their families additional headache and distress.  Therefore, with the intent to knowingly and improperly avoid paying money owed to the Untied States (as compared to the years of prolific fraud), Intrepid – led by Bob Parker, Paul McMullen, and Human Resources employees Erica Moreno and Kyle Chandler – is more than willing to "mothball" agencies, discharging all patients entrusted to its care and terminating all employees who did Intrepid's bidding for years.

144. Relators have knowledge that the following Intrepid agencies have been "mothballed" in this manner: Birmingham, AL; Anniston, AL; Montgomery, AL; and Clive, IA. Further, it is believed that these are only a fraction of the offices "mothballed" by Intrepid.

## G. Defendant Intrepid USA Knowingly Bills Medicare for Home Health Services Without Performing Services and Certifications Required for Payment.

145. Defendant Intrepid disregarded specific instructions from CMS and habitually billed Medicare for home health services purportedly provided to patients that were not actually certified for home health services. Specifically, Defendant falsely claimed patients were eligible for Medicare home health services without performing the required face-to-face evaluation. With knowledge that patients had not been evaluated by a physician – in-person – to assess eligibility for the Medicare home health benefit, Defendant billed Medicare for home health services provided to these patients, thereby submitting false claims for payment.

146. The following patients and care episodes in the Memphis, TN agency are examples of false claims submitted by Intrepid because the patients' face-to-face certification was deficient and non-billable: Patient C.C.: Care Episode 7/18/18-9/16/18; Patient R.R.; Care Episode: 7/27/2018-9/25/2018; Patient D.B. Care Episode 7/27/2018-9/25/2018; Patient J.H. Care Episode 8/22/2018-10/20/2018; Patient T.S. 8/27/2018-10/25/2018.

147. In fact, a review performed by Relator Watts found that, in a random sample of six patients in the Memphis, TN agency, only one had a valid and billable face-to-face documentation. After providing education on proper face-to-face procedures to staff in Memphis, the Compliance department reviewed another random sample of six patients. All six had deficient and non-billable face-to-face evaluations. Yet, Intrepid billed Medicare for all twelve of these care episodes—each representing false claims for payment.

148.    Intrepid was alerted to its incomplete certifications and non-billable claims through TPE audits performed by MAC CGS Administrators LLC (CGS) in Defendants' Knoxville, TN and Sweetwater, TN home health agencies. Specifically, in April 2019, the TPE auditors informed Defendant that it was improper – and non-billable – to submit RAP bills to Medicare prior to performing a face-to-face evaluation to determine whether the patient is eligible for the Medicare Home Health Benefit. Consequently, Intrepid was required to refund the amount of sampled claims containing incomplete and false certifications in these two Tennessee agencies.

149.    Further, the MAC auditors directed Intrepid that in order to comply with Medicare Home Health Certification conditions of payment, Intrepid must combine the certification (which includes the face-to-face encounter) and the Plan of Care to a single Certification and Plan of Care document (the "485"). CGS auditors unequivocally instructed Intrepid to include the date of the face-to-face evaluation on the 485. CMS and other MACs, in addition to CGS, to which Intrepid bills for Medicare home health services, also clearly require the date of the face-to-face evaluation be included on the Certification and Plan of Care document. As addressed *supra,* performing the face-to-face evaluation to assess a patient for eligibility prior to billing for home health services is not a new requirement or just limited to CGS administered jurisdictions. Instead, Intrepid's pervasive non-compliance was simply discovered by CGS TPE auditors and specifically enforced upon Intrepid.

150.    For Intrepid to get in compliance with these Medicare requirements, Relator Rigney led a team in the Compliance Department tasked with developing a new "485" certification and plan of care template for use throughout Defendant's operations. This new certification plan combined the certification and Plan of Care and included the required certifications that the face-to-face evaluation had been completed, along with its date of its performance.

151.    The Start of Care Template was part of Intrepid's Kinnser electronic medical record software system and completed electronically by Intrepid clinicians.  The instructions to the Start of Care Template provide that "if the patient has not had a Face to Face before the Start of Care, the date on the template in the oasis is left blank."  Further, the Start of Care Template has a note attached to the 485 stating "DO NOT RELEASE THIS THERE IS NO F2F NOTE YET."  Intrepid clinicians are then instructed that "the 485 will be complete WITHOUT the date in the F2F template, but will NOT be checked out of orders manager. The agencies' Clinical Supervisor should then ensure that the patient has a F2F visit scheduled, that the date on the 485 is correct, we have the F2F encounter note to match and it meets all the criteria for the F2F encounter. Then, after the actual face-to-face visit is obtained, it is to be attached to the 485 (and labeled as the F2F)."  At this point – when the F2F is completed, attached to other admission documentation, and dated – the 485 (certification and plan of care) may be released or checked out and Request for Anticipated Payment (RAP) billing is automatically submitted to the MAC by the electronic system.

152.    To ensure that the RAP was not billed prematurely without the completed face-to-face visit, the electronic system of the new Start of Care Template had a feature that would hold the RAP billing until the face-to-face visit was complete and attached to the 485 with its date noted in the system. The feature that would hold the RAP billing until the face-to-face was completed and properly recorded was referred to within Intrepid as a "failsafe."

153.    On June 12, 2019, Intrepid's non-compliant previous admission process and accompanying documentation known as the "Patient Admission Summary" was retired and the new Start of Care Template – developed by Relator Rigney's team to comply with Medicare regulations – was implemented.

154.    When implementing the Start of Care Template, Relator Rigney expected that a small minority of RAP claims would actually be delayed by waiting for the face-to-face documentation.  Any disruption was expected to be minimal, as Relator Rigney, based on her long career in home health, knew that a patient's admission to home health service, generally, begins with some sort interaction with a physician—be it a hospital discharge or a visit with the patient's primary care physician.

155.    This follows a legitimate admission pattern where a patient sees a physician, the physician recognizes a need for medical service, and the physician refers the patient to a provider of that service.  In this legitimate admission scenario, the encounter with the physician who then refers the patient to home health is the face-to-face visit and should not delay RAP billing because it is the triggering event of the home health admission.

156.    However, when the new Start of Care Template was released, a large percentage of RAP billing across Intrepid's operations was delayed because the face-to-face was not completed at the Start of Care.  Relators recognized that the delay in billing indicated a fundamental problem with Intrepid's aggressive sales force-driven operation and, in turn, Intrepid's often ineligible patient population.

157.    The problem was that many of Intrepid's patients were not initiating home health episodes because of a face-to-face encounter with a physician.  Instead, Intrepid's admission pattern more commonly began with Intrepid's sales department aggressively soliciting patients who had not seen a physician—such as through the Call-Back Program addressed *supra*.  If the patient would agree to an assessment by Intrepid's nurses, the patient would be admitted to home health service and Medicare would be billed at this step.  Only after already receiving payment

would Intrepid convince the patient to see a physician for the face-to-face encounter to actually certify the patient as eligible for home health care.

158.     Intrepid had turned the entire admission process on its head and it was not until the CGS auditors enforced Medicare requirements designed to prevent this exact situation prevalent throughout Intrepid's operations that the pervasiveness of this backwards admission process was exposed. Accordingly, when the proper procedure was implemented, RAP billing was delayed for a significant percentage of patients because they had not had a face-to-face encounter at the Start-of-Care. This caused a major cash-flow problem for the Intrepid.

### H.   Intrepid's Corporate Management Decides to By-Pass the Requirement that the Plan of Care Contain the Accurate Date of a Completed Face-to-Face Encounter.

159.     Faced with serious cash-flow problems, the operations department – led by Vice President Paul McMullen – became involved in what had previously been the compliance department-directed project of implementing the new Start of Care Template. Tellingly, only after Intrepid experienced cash-flow impediments (caused by suddenly instituting the required procedures on Intrepid's widespread non-compliant operations) Intrepid executives – primarily VP of Operations Paul McMullen and Chief Compliance Officer Bob Parker – began to argue that including the verification of the face-to-face date on the 485 was not actually mandatory and that the company should revert to submitting RAP billings prior to actually certifying that the patient was eligible for the Medicare Home Health Benefit.

160.     Over a series of meetings in June 2019, Relator Rigney and her clinical team debated the operations department (and Bob Parker, who, despite being Chief Clinical Officer, sided with the operations department) over whether it was mandatory to hold the RAP billing until the face-to-face was completed, recorded, and dated on the 485. Relator Rigney and her clinical team insisted that, in order to comply with the clear and direct orders from the TPE auditors and

Medicare regulations, Intrepid could not submit RAP bills until the face-to-face was completed. Outside expert consultants were contacted to provide guidance and agreed with Relator Rigney and the clinical team that the RAP may not be billed without including a completed and dated face-to-face on the 485. In response to the cogent arguments that billing RAP without a completed and dated face-to-face visit was impermissible, McMullen and Parker retorted that Intrepid needed to bill the RAP prior to determining if the patient is eligible because doing so "gets money in the door."

161.   Despite McMullen's and Parker's opposition, Relator Rigney – at this point in mid-June 2019 – believed the issue was settled and sufficient consensus reached that it was improper to bill RAP without a valid, dated face-to-face evaluation certifying the patient as eligible for the Home Health Benefit and therefore Intrepid would not do so. However, Relator Rigney would soon find out that Intrepid's corporate officers, led by Parker and McMullen, secretly instituted a fraudulent process that would turn off the "fail-safe," causing RAP bills to be automatically submitted without a face-to-face evaluation certifying the patient as eligible for the Medicare Home Health Benefit.

162.   Specifically, in or around late June and early July 2019, Relator Rigney was alerted by several agency administrators that, contrary to their instructions from the Compliance Team and the Start of Care Template instructions, the administrators noticed RAP billings were being automatically submitted for payment without valid, face-to-face evaluations and without the administrators' knowledge. Upon investigation of these concerns, Relator Rigney confirmed that this was occurring and was informed by Intrepid Compliance employee Susan Duty that the Kinnser system fail-safe feature had been surreptitiously turned off at the order of Parker and McMullen.

163. Intrepid, directly led by senior executives, simply used a back channel to submit false claims after being specifically told not to do so by Medicare auditors and its own compliance staff. Moreover, to deceive MAC TPE auditors, Parker and McMullen allowed the fail-safe to remain in effect for the offices that were under TPE audit, including the Knoxville and Sweetwater, TN agencies where non-compliant face-to-face documentation triggered the auditors' concerns and initiated the short-lived overhaul of Intrepid's process in the first place. The fact that Intrepid allowed the compliant procedures to remain in currently audited offices and knowingly reverted to submitting false claims elsewhere demonstrates that Intrepid clearly understood and appreciated how to comply with Medicare conditions of payment yet knowingly chose not to do so in order to maintain its cash flow built upon a fundamentally fraudulent business.

164. On July 15, 2019, soon after administrators and compliance staff discovered that the fail-safe had been turned off and RAP was being billed without the patient having a complete certification of eligibility, Intrepid Management sent a false and intentionally misleading memo titled: "Plan of Care (485) Requirements and Billing the Request for Anticipated Payment (RAP)." This July 15 Memo was sent to all agency administrators and selected corporate compliance and operations personnel. Notably, Relator Rigney, a Compliance Department senior employee but vocal opponent to Parker and McMullen's fraudulent initiative, was not copied on the email sending the July 15 Memo. With no explanation, guidance, or interpretation, the memo selectively cited two Medicare regulations that senior management purported to permit Intrepid to submit RAP billings without a face-to-face visit performed. Through this memo, Intrepid Executive Management attempted to explain why Intrepid's sudden reversal of its policy was justified—despite being clearly inappropriate.

165.    The administrators and clinical staff had just gone through months of training, development, and education on transitioning to the Start of Care Template and knew that Medicare and, specifically, CGS TPE auditors had instructed Intrepid to cease billing in the manner that Intrepid was now instructing.  Several administrators immediately contacted Relator Rigney to voice concerns about the July 15 Memo and Intrepid's reversion to a known non-compliant policy.  Specifically, administrator Samantha Limeberry of the Jackson, TN agency, contacted Relator Rigney, stating that this reversion to the old process was improper; in support of her opinion, she sent Relator Rigney copies of the Medicare Conditions of Payment clearly refuting the propriety of Intrepid's July 15 Memo and its directives.  Additionally, Scott McLoughlin, an administrator in North Carolina, voiced similar concerns and refused to follow Intrepid's obviously fraudulent corporate directives, saying that "I can't be on the OIG [excluded provider] list."

## I.  Relators' Efforts to Prevent False Claims from Being Submitted and Retaliatory Discharge in Violation of 31 U.S.C. §3730(h)

166.    Relator Rigney sought to assure the compliance-minded administrators that the issue would be resolved while seeking opportunity to convince Executive Management that its course of action was clearly fraudulent and a disastrous compliance situation.  As a quick fix, Relator Rigney instructed the administrators to leave patient admission paperwork in "incomplete" status to prevent the Kinnser system from automatically submitting the false claims for RAP billing when face-to-face had not been performed, documented, and dated on the 485.  Simultaneously, Relator Rigney tried to get in contact with Bob Parker and Paul McMullen to speak with them about this issue, but her direct supervisors avoided her regarding this critical issue.

167.    Relator Rigney was able to get in contact with Carolyn Williams, Director of Clinical Excellence and Relator Rigney's counterpart.  In one conversation with Ms. Williams, Relator Rigney had several agency administrators join the conference call so Ms. Williams could

directly hear the concerns that Relator Rigney was facing. The administrators informed Ms. Williams of their steadfast opinion that the July 15 Memo and company's reversion to previously known fraudulent policies was very concerning. After attempting to hold the company line that the reversion to prior policy was compliant, Ms. Williams essentially conceded that the administrators' concerns were valid, stating that she would speak to Bob Parker and Paul McMullen about the Intrepid's course of action.

168.    Meanwhile, during this tumultuous late July 2019 period, Relator Watts continued to perform her duties, auditing patient records and addressing non-billable claims in the Memphis, TN agency. The Memphis agency came under TPE audit in December 2018 and, due to the known significant compliance issues in the Memphis office, Intrepid Executive Management suspended all billing in the Memphis agency until an internal audit review could be performed. Finally, in May 2019, after receiving several inquiries from Medicare about the lack of billing from the Memphis agency, Relator Watts and her counterpart Ashley Benson undertook a compliance review of the Memphis agency's charts. Unsurprisingly, Relator Watts found widespread non-compliance with the agency's eligibility documentation, including ineligible non-qualifying patients and a lack of face-to-face eligibility certifications on the Memphis agency's census, along with a pervasive amount of medically unnecessary therapy billed to Medicare.

169.    Relator Watts relayed the significant non-compliance in the Memphis agency to Chief Compliance Officer Carolyn Williams and provided Ms. Williams a detailed spreadsheet of roughly 100 patient care episodes that did not meet the Medicare conditions of payment, were non-payable, and should not be billed. In this spreadsheet, Relator Watts provided detailed explanations of why each claim was non-billable. The most common reasons were the face-to-face evaluation had never been performed or was not properly documented. Other reasons – which

were not mutually exclusive of the face-to-face issues – included non-homebound and otherwise ineligible patients and medically unnecessary therapy. The reimbursement total for these 100 non-billable claims was $187,000. Relator Watts also forwarded to Ms. Williams an additional 19 more non-billable episodes, without calculating the precise amount of the claim.

170.    Examples of patients in the Memphis Office identified as non-billable include Patient P.A., Care Episode 2/23/2019-4/23/2019; Patient B.B., Care Episode: 2/5/2019-4/5/2019; Patient C.B., Care Episode 1/16/2019-3/16/2019; Patient C.B.2, Care Episode: 1/18/2019-3/18/2019; Patient M.B., Care Episode: 2/10/2019-4/19/2019.

171.    After sending this list of non-billable care episodes, Relator Watts realized that 50 of the 100 non-billable claims were, in fact, billed. Shocked, Relator Watts sent an email to Carolyn Williams and Relator Rigney, her supervisors in the Compliance Department, inquiring why these known non-billable claims – representing roughly $95,000 of false claims for payment – were billed.

172.    Throughout the last days of July 2019, Relator Rigney was persistently trying to get in touch with Bob Parker, Chief Compliance Officer. However, he ignored all of her calls, text messages, and voicemails. In these communications, Relator Rigney sought to prevent false claims from being submitted and vehemently expressed her disagreement with the corporate decision to disregard the face-to-face requirements, as well as the decision to fraudulently bill the 50 care episodes clearly classified as non-billable by Relator Watts, Ms. Benson, and the Compliance Department.

173.    On July 30, 2019, Relator Rigney finally spoke with Paul McMullen and informed him, in an effort to prevent false claims from being submitted, that the corporate decision to bill RAP payments without face-to-face documentation was improper and should be discontinued

immediately because this practice was in direct contradiction to Medicare guidelines and specific instructions from the Medicare auditors. Mr. McMullen, however, provided no meaningful response.

174. On the morning of July 31, 2019, both Relators had conversations with Director of Clinical Excellence Carolyn Williams. Ms. Williams informed Relator Rigney that she had discussed Relators' concerns with Chief Compliance Officer Bob Parker and, specifically, the concerns related to Intrepid's sudden reversal of the face-to-face requirement policy—which Relator Rigney emphasized on multiple occasions, including July 31, 2019, was fraudulent and would cause the submission of false claims for home health services. Mr. Parker's responded that he "was not going to change anything" and when Medicare home health benefits switched over to a new payment system (called Patient-Driven Payment Model (PDPM), where split payment RAP billings would no longer be submitted) in January 2020, the situation would resolve itself. Effectively, Mr. Parker – through Ms. Williams – was saying that Intrepid would knowingly submit false claims for the next five months, regardless of Relators' protests and efforts to prevent this fraud. Relator Rigney further addressed the concerns about the 50 non-billable claims submitted, despite Relator Watts' detailed analysis demonstrating why these claims were not billable, yet received no meaningful response.

175. Relator Rigney questioned Ms. Williams about what she was supposed to tell her administrators and compliance employees because Parker's instruction to knowingly commit fraud for the next five months was obviously untenable. Ms. Williams did not have an answer, to which Relator Rigney stated "well, someone is going to report the company." Relator Rigney also informed Ms. Williams that she had instructed her administrators and compliance employees that "if they were asked to do anything that made them uncomfortable or they believed was improper,

they should call the corporate compliance hotline, and if they were not satisfied with the response from Intrepid, to contact the CMS Medicare Fraud Hotline."

176.    Within one hour of Relator Rigney's conversation with Ms. Williams, she received an invitation to a conference call with Bob Parker and Human Resources employee Erica Moreno. On this conference call, Relator Rigney was informed that she was terminated from her employment with Intrepid—effective immediately. Intrepid provided the pretext that Relator Rigney's position was being eliminated as the explanation for her termination.  This explanation was purely fabricated as Carolyn Williams held the same position, albeit with less seniority within Intrepid than Relator Rigney, but was willing to acquiesce to Intrepid's fraudulent directives and thus remained employed.  Further, Relator Rigney had been consistently promoted and never subject to discipline throughout her tenure with Intrepid.

177.    Therefore, it is clear that Relator Rigney was terminated in violation of 31 U.S.C. § 3730(h) in retaliation for her efforts to prevent false claims from being submitted.  Such efforts include Relator Rigney's longstanding and vocal opposition to Intrepid's business practices of submitting false claims addressed herein, billing of home health services for ineligible patients, making the fraudulent reversal of Intrepid's face-to-face billing practices, and knowingly submitting the 50 specific false claims at the Memphis, TN agency.

178.    On July 31, 2019 – the date both Relators were terminated – Relator Watts was continuing to raise concerns about the 50 non-billable Memphis claims that had already been falsely billed.  Relator Watts was falsely informed that Carolyn Williams reviewed these claims and determined that the 50 claims billed were, in her opinion, billable and that is why the claims were submitted.  Shortly after, Relator Watts emailed Ms. Williams and asked what did Relator Watts miss in her review to come to a different opinion about these claims.  Ms. Williams

responded that she had not reviewed any of the non-billable claims identified by Relator Watts and her compliance team but they were billed simply because Paul McMullen ordered the claims be billed. Ms. Williams also informed her that there was no rationale or attempt to justify the selected 50 care episodes but that Intrepid just billed the top 50 claims in the spreadsheet of non-billable claims Relator Watts created. Ms. Williams acknowledged the impropriety of submitting these bills for payment, stating that she did not agree but that Paul McMullen had instructed to bill these episodes, which is why it was ultimately done.

179.    Accordingly, Intrepid simply lied to Relator Watts about Ms. Williams' non-existent review of these claims to justify submitting false claims for payment.

180.    Soon after Relator Rigney was terminated, Relator Watts received an invite to a conference call with Bob Parker and Erica Moreno. Relator Watts was informed that she was being terminated from her position at Intrepid—effective immediately. Relator Watts was informed that the reason for her termination was that Intrepid was "dissolving her position." As was the case with Relator Rigney, this justification was pure pretext, as other employees with less seniority in the same position remained employed. Further, Relator Watts had been consistently promoted and never subject to discipline throughout her tenure with Intrepid.    Relator Watts directly asked, "does [my termination] have to do with the non-billable claims in Memphis?" Despite being Chief Compliance Officer, directly involved in the Memphis review and receiving direct complaints about the Memphis claims being fraudulently billed from both Relator Watts and Rigney, Bob Parker responded: "I have no idea what you are talking about."

181.    Therefore, it is clear that Relator Watts was terminated in violation of the 31 U.S.C. § 3730(h) in retaliation for her efforts to prevent false claims from being submitted, including her longstanding and vocal opposition to Intrepid's business practices of submitting false claims

addressed herein, billing of home health services for ineligible patients, making the fraudulent reversal of Intrepid's face-to-face billing practices, and knowingly submitting the 50 specific false claims at the Memphis, TN office.

## COUNT ONE
### PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. §3729

182.     Relators adopt and incorporate paragraphs 1-181 as though fully set forth herein.

183.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

    a.     Defendant submitted false claims for home health care provided to patients whom Defendant knew or should have known were not homebound or did not require skilled care and did not meet Medicare or Medicaid requirements for home health care, in violation of, *inter alia*, 42 U.S.C. §1395f and 42 C.F.R. §484;

    b.     Defendant submitted false claims for duplicative home health care provided to patients whom Defendant knew already had full access to necessary care;

    c.     Defendant submitted false claims for home health care services provided to patients by unqualified staff;

    d.     Defendant submitted false claims for home health care PPS payments that were fraudulently inflated by therapy services that were medically unnecessary or never performed;

    c.     Defendant submitted false claims for home health care PPS payments that were fraudulently inflated by false OASIS patient assessment data, in violation of, *inter alia*, 42 U.S.C. §1395f and 42 U.S.C. §484;

    d.     Defendant submitted false claims for home health care that Defendant never provided and did not intend to provide;

    e.     Defendant submitted false claims for home health care for patients that were never appropriately certified for the Medicare Home Health Benefit;

e.    Defendant submitted false claims for home health services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

184.    The United States paid the false claims described herein and summarized in the previous paragraph.

185.    Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States.

186.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare for such false or fraudulent claims.

187.    WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT TWO
### MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

188.    Relators adopt and incorporate paragraphs 1-181 as though fully set forth herein.

189.    By and through the fraudulent schemes described herein, Defendant knowingly - by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

a.    Defendant made and used false records reflecting nursing and therapy visits that were not medically necessary, did not qualify as skilled services, or were rendered to patients who did not qualify under the Medicare home health benefit, all in violation of 42 U.S.C. §1395y(a)(1)(A) and the Medicare regulations cited *supra*;

b.    Defendant made and used false Home Health Certification Statements and Plans of Care to falsely submit claims for home health services without properly certifying patients as eligible for such services;

c.    Defendant made and used false patient assessment data that inaccurately reflected patient conditions or falsely emphasized conditions that were not part of the patients' legitimate home health needs;

d.    Defendant made and used false clinical documentation, including plans of care, therapy evaluations, progress notes and nursing notes;

e.    Defendant made and used false CMS Forms 1450 and 855A and other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when in fact Defendant intended to – and did – defraud the Medicare system by falsely claiming inflated home health PPS payments. The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendant to the United States.

190.    In reliance upon Defendant's false statements and records, the United States paid false claims submitted by Defendant that it would not have paid if not for those false statements and records.

191.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

192.    WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT THREE
### "REVERSE FALSE CLAIMS" UNDER 3729(a)(1)(G)

193.  Relators adopt and incorporate paragraphs 1-181 as though fully set forth herein.

194.  By and through the fraudulent schemes described herein, Defendant knowingly — by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

a.      Defendant knew that it incurred significant liability to the Medicare Program through targeted audits identifying non-billable claims submitted by Defendant, yet Defendant chose to improperly avoid its obligation to refund the Medicare program and instead "mothballed" its indebted Home Health Agencies;

b.      Defendant knew that it had received millions of dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

c.      Defendant knew that it had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, and by the provision of unnecessary services, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

195.  As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

196.  WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of

Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT FOUR
### CONSPIRACY UNDER 31 U.S.C. 3729(a)(1)(C)

197. Relators adopt and incorporate paragraphs 1-181 as though fully set forth herein.

198. Defendant knowingly conspired to present or cause to present false or fraudulent claims for payment or approval, conspired to make or use, a false record or statement material to a false or fraudulent claims and conspired to conceal or knowingly and improperly avoid or decrease obligations to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(C) to wit: Defendant knew that it incurred significant liability to the Medicare Program through targeted audits identifying non-billable claims submitted by Defendant, yet with the agreement and actions undertaken by outside consultant Corridor Group, Defendant improperly avoided its obligation to refund the Medicare program and instead "mothballed" its indebted Home Health Agencies.

199. As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

200. WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT FIVE
### RETALIATION UNDER 31 U.S.C. 3730(h)(1)

201. Relator Rigney adopts and incorporates paragraphs 1-181 as though fully set forth herein.

71

202. Defendant knowingly threatened, harassed, discriminated against, and discharged Relator Rigney because of lawful acts done by Relator Rigney in efforts to stop or prevent violations of the False Claims Act.

203. As a result of Defendant's retaliatory conduct, Relator Rigney has suffered damages of extended periods of lost pay, irreparable harm to her personal and professional reputation, undue hardship forced upon Relator Rigney and her family, and extended infliction of emotional distress upon Relator Rigney and her family.

WHEREFORE, Relator Rigney demands judgment in her favor and against Defendant, in an amount of two times the amount of back-pay accrued since Relator Rigney's termination, interest on that back-pay, and compensation for special damages caused by Defendant's discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C. § 3730(h)(2).

## COUNT SIX
### RETALIATION UNDER 31 U.S.C. 3730(h)(1)

204. Relator Watts adopts and incorporates paragraphs 1-181 as though fully set forth herein.

205. Defendant knowingly threatened, harassed, discriminated against, and discharged Relator Watts because of lawful acts done by Relator Watts in efforts to stop or prevent violations of the False Claims Act.

206. As a result of Defendant's retaliatory conduct, Relator Watts has suffered damages of extended periods of lost pay, irreparable harm to her personal and professional reputation, undue hardship forced upon Relator Watts and her family, and extended infliction of emotional distress upon Relator Watts and her family.

72

WHEREFORE, Relator Watts demands judgment in her favor and against Defendant, in an amount of two times the amount of back-pay accrued since Relator Watts' termination, interest on that back-pay, and compensation for special damages caused by Defendant's discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C. § 3730(h)(2).

Respectfully submitted,

Brian M. Vines
Kentucky Bar No. 96419
**HARE WYNN NEWELL & NEWTON**
325 West Main Street
Suite 210
Lexington, Kentucky 40507
Tel: (859) 550-2900
bvines@hwnn.com

**FROHSIN BARGER & WALTHALL**
James F. Barger Jr.
Georgia Bar No. 843064
J. Elliott Walthall
Alabama Bar No: 0967-E58W
Benjamin P. Bucy
Georgia Bar No: 526064
100 Main Street
Saint Simons Island, Georgia 31522
Tel: (205) 933-4006
jim@frohsinbarger.com
elliott@frohsinbarger.com
ben@frohsinbarger.com

Attorneys for Relators

## Certificate of Service

On or before the 14th day of February 2020, Relators hereby certify that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of this *Qui Tam* Complaint has been executed as follows:

**By Certified Mail to:**

United States Attorney's Office for the Western District of Kentucky
Attn.: Assistant United States Attorney Benjamin Schecter
717 West Broadway
Louisville, KY 40202

**By Certified Mail to:**

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Brian M. Vines
OF COUNSEL